ACCEPTED
01-14-00707-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
11/30/2015 9:41:21 AM
CHRISTOPHER PRINE
CLERK

IN THE COURT OF APPEALS
FOR THE FIRST JUDICIAL DISTRICT OF TEXAS
AT HOUSTON, TEXAS

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
11/30/2015 9:41:21 AM
CHRISTOPHER A. PRINE
Clerk

NO. 01-14-00707-CV

MARINECORP INTERNATIONAL, LTD.,
Appellant,

v.

THE CHOPPER GROUP, LLC AND OUTLAW COUNTRY, LLC
Appellees.

On Appeal From the 80TH Judicial District Court,
Harris County, Texas, Cause No. 2012-23983

## APPELLEES, THE CHOPPER GROUP, LLC, BACKWOODS COUNTRY CLUB, LLC, TONY MILLER AND KYLE TONES' BRIEF

| | |
|---|---|
| **THE AKERS FIRM** | **THE COCHELL LAW FIRM, P.C.** |
| Brock C. Akers | Stephen R. Cochell |
| State Bar No.: 00953250 | State Bar No. 24044255 |
| 3401 Allen Parkway, Suite 101 | 555 W. Loop S., Suite 200 |
| Houston, Texas 77019 | Bellaire, Texas 77401 |
| Telephone: (713) 877-2500 | Telephone: (832) 767-1065 |
| Facsimile: (713) 583-8662 | Facsimile: (832) 767-1686 |
| bca@akersfirm.com | srcochell@gmail.com |
| | |
| ATTORNEY FOR APPELLEES, | ATTORNEY FOR APPELLEE, |
| THE CHOPPER GROUP, LLC., | KYLE TONES |
| BACKWOODS COUNTRY CLUB, | |
| LLC. AND TONY MILLER | |

**ORAL ARGUMENT NOT REQUESTED PURSUANT TO TEX. R. APP. P.
39.1 and 39.7**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................... ii

INDEX OF AUTHORITIES ........................................................................ vii

STATEMENT REGARDING ORAL ARGUMENT ........................................... xii

ISSUES PRESENTED ................................................................................ xiii

ISSUE ONE

Chopper and Outlaw Gave Marinecorp Written Notice of Each Default and Thirty Days to Cure Each of its Breaches of the Lease. The Lease Agreements Did Not Require Written Notice of Marinecorp's Defaults by Certified Mail, Return Receipt Requested.

ISSUE TWO

After Marinecorp Breached the Implied Warranty of Suitability and Committed Deceptive Trade Practices in Regard to the Parking-Lot Lights, Leaking Roof, Electrical Wiring, and Air Conditioning, Chopper and Outlaw Country Lawfully Tried to Protect Their Investment by Continuing Under the Leases and Asking Marinecorp to Fix the Problems. The *Griffin* Rule is Inapplicable Under the Facts of This Case.

ISSUE THREE

Sufficient Evidence Supported the Jury's Finding that Marinecorp Failed to Mitigate its Alleged Damages.

ISSUE FOUR

Sufficient Evidence Supported the Jury's Verdict. The Jury was not Required to Conclude that Outlaw Country Delayed its Own Opening.

ISSUE FIVE

The Trial Court Correctly Rejected Marinecorp's Proposed Jury Question Concerning Whether Outlaw Country Failed to Mitigate its Damages Because Neither the Law nor Evidence Supported such a Question in This Case.

ISSUES SIX THROUGH EIGHT

Issues Six Through Eight Should be Overruled Because Sufficient Evidence Showed Marinecorp Committed Deceptive Trade Practices and Separately Breached its Written Lease Agreements with Chopper and Outlaw. The record does not show Chopper and Outlaw Country attempted to bring a Property Code wrongful-eviction claim under the DTPA.

ISSUE NINE

The Trial Court's Modified Final Judgment Awarding Prejudgment Interest Should be Affirmed Because Issue Nine is Unpreserved for Appellate Review.

ISSUE TEN

On Appeal, Marinecorp has not Shown Entitlement to Damages for Alleged Breach of Guaranty.

ISSUE ELEVEN

The Trial Court did not Award Cumulative Damages for DTPA Violations and Breach of Contract.

ISSUE TWELVE

On Appeal, Marinecorp has not Shown Entitlement to Damages for Alleged Breach of a Promissory Note.

ISSUE THIRTEEN

Legally and Factually Sufficient Evidence Supports the Trial Court's Judgment Awarding Actual Damages.

STATEMENT OF FACTS ...................................................................................1

    A.    Tony Miller's Testimony and Choppers Sports Bar & Grill...............................................................................................1

    B.    The Second Lease – Outlaw Country.......................................5

    C.    The Unrepaired Roof at Outlaw Country.................................8

    D.    Marinecorp's Failure to Timely Provide Electrical Hookups at Outlaw Country.................................................9

    E.    Marinecorp's Failure to Timely Provide the Sixty Tons of Air Conditioning ...............................................11

    F.    Testimony of Realtor Tibbs: The Lockout and Marinecorp's Use of Miller.................................................13

    G.    Testimony of Investor Kyle Tones........................................16

    H.    Testimony of Marinecorp's Property Manager Mike Mirza.............................................................................17

    I.    Testimony of Marinecorp's Corporate Representative Ed Wolochin ...................................................................21

    J.    The Re-Finance and Marinecorp's Reluctance to Lease to Alcohol Vendors.................................................22

    K.    The Jury's Verdict.................................................................22

SUMMARY OF THE ARGUMENT ................................................................23

ARGUMENT AND AUTHORITIES ..................................................................24

ISSUE ONE (RESTATED) ..............................................................................24

    A.    De Novo Standard of Review Applies to Contractual Notice Clause ...............................................................................26

    B.    Standard of Review for Legal and Factual Sufficiency ......................27

    C.    Chopper and Outlaw Country Satisfied the Notice Clause.................28

ISSUE TWO (RESTATED) .............................................................................32

    A.    Sufficient Evidence Supports the Jury's Finding that Marinecorp Breached First.................................................................34

    B.    Chopper and Outlaw Country were Allowed to Try to Protect their Investment by Working to Continue Under the Leases ...............................................................................34

    C.    Even under a Strict Contract Analysis, Jury Question Three was Proper because *Griffin* is inapplicable..............................41

ISSUE THREE (RESTATED) ...........................................................................44

ISSUE FOUR (RESTATED)............................................................................46

ISSUE FIVE (RESTATED) .............................................................................48

    A.    Marinecorp cites no legal authority that a tenant has a duty to mitigate the landlord's breach of the implied warranty of suitability especially *before* the landlord even commits the breach..........................................................................48

ISSUES SIX THROUGH EIGHT (RESTATED)....................................................51

    A.    Texas law recognizes that DTPA violations and breach of contract may arise in the context of a single case ..............................52

B. Factually and legally sufficient evidence proved Chopper and Outlaw Country's various DTPA claims and contract cause of action ..................................................53

    1. Breach of Implied Warranty of Suitability ..............................57

    2. Fraudulent Inducement ................................................59

    3. Unconscionable Course of Action ............................................60

    4. Continued Unconscionable Course/Breach of Contract ...................................................61

ISSUE NINE (RESTATED) ..................................................62

ISSUE TEN (RESTATED) ..................................................63

ISSUE ELEVEN (RESTATED) ..................................................64

ISSUE TWELVE (RESTATED) ..................................................66

ISSUE THIRTEEN (RESTATED) ..................................................67

CONCLUSION & PRAYER ..................................................71

CERTIFICATE OF COMPLIANCE ..................................................73

CERTIFICATE OF SERVICE ..................................................74

# INDEX OF AUTHORITIES

**CASES**

*ACS Investors, Inc. v. McLaughlin*,
    943 S.W.2d 426 (Tex. 1997) ..............................................................................26

*Akin v. Santa Clara Land Co., Ltd.*,
    34 S.W.3d 334 (Tex. App.—San Antonio 2000, pet. denied)..............................30

*Austin Hill Country Realty, Inc. v. Palisades Plaza, Inc.*,
    948 S.W.2d 293 (Tex.1997)......................................................................... 44, 45

*B&W Supply, Inc. v. Beckman*,
    305 S.W.3d 10 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ...... 41, 42, 43

*Besteman v. Pitcock*,
    272 S.W.3d 777 (Tex. App.—Texarkana 2008, no pet.).....................................29

*Cain v. Bain*,
    709 S.W.2d 175 (Tex. 1986) ......................................... 27, 32, 34, 46, 48, 62, 71

*Chapman v. Abbot*,
    251 S.W.3d 612 (Tex. App.—Houston [1st Dist. 2007, no pet.) .................. 26, 27

*Cheung-Loon L.L.C. v. Cergon, Inc.*,
    392 S.W.3d 738 (Tex. App.—Dallas 2012, no pet.) ...........................................30

*Church & Dwight Co. v. Huey*,
    961 S.W.2d 560 (Tex. App.—San Antonio 1997, pet. denied)...........................53

*City of Keller v. Wilson,*
    168 S.W.3d 802 (Tex. 2005) ................................................ 27, 32, 46, 48, 62, 71

*Coker v. Coker,*
    650 S.W.2d 391 (Tex. 1983) ...................................................................... 26, 27

*Commercial Escrow Co. v. Rockport Rebel, Inc.,*
    778 S.W.2d 532 (Tex. App.—Corpus Christi 1989, writ denied).......................60

*D.R. Horton-Tex., Ltd. v. Markel Int'l Ins. Co.,*
    300 S.W.3d 740 (Tex. 2009) ...................................................................... 63, 66

*Davidow v. Inwood N. Prof'l Group—Phase I,*
    747 S.W.2d 373 (Tex. 1988) ...................................................... 35, 36, 38, 40, 57

*Doe v. Boys Clubs of Greater Dallas, Inc.,*
    907 S.W.2d 472 (Tex. 1995) .............................................................................53

*Drury Southwest, Inc. v. Louie Ledeaux #1, Inc.,*
    350 S.W.3d 287 (Tex. App.—San Antonio 2011, pet. denied).................... 53, 59

*Gen. Land Office of State of Tex. v. OXY U.S.A., Inc.,*
    789 S.W.2d 569 (Tex. 1990) .............................................................................67

*Gober v. Wright,*
    838 S.W.2d 794 (Tex. App.—Houston [1st Dist.] 1992, writ denied).......... 38, 63

*GTE Mobilnet of S. Tex. v. Pascouet,*
    61 S.W.3d 599 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).................28

*Gym-N-I Playgrounds, Inc. v. Snider*,
   220 S.W.3d 905 (Tex. 2007) ....................................................................... 57, 58

*Heritage Res., Inc. v. NationsBank*,
   939 S.W.2d 118 (Tex. 1996) ..............................................................................26

*Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am., Inc.*,
   341 S.W.3d 323 (Tex. 2011) ..................................... 35, 36, 39, 40, 49, 52, 63, 68

*Jim Walters Homes, Inc. v. Valencia*,
   690 S.W.2d 239 (Tex. 1985) ..............................................................................56

*Long Trusts v. Griffin*,
   222 S.W. 3d 412 (Tex. 2006)(per curiam) ................................................... 35, 42

*Lyons v. Montgomery,*
   701 S.W.2d 641 (Tex. 1985..............................................................................26

*Meeker v. Tarrant Cty. Coll. Dist.*,
   317 S.W.3d 754 (Tex. App.—Fort Worth 2010, pet. denied)..............................68

*Nguyen v. Woodley*,
   273 S.W.3d 891 (Tex. App.—Houston [14th Dist.] 2008, no pet.) .....................30

*Parts Indus. Corp. v. AVA Svs., Inc.*,
   104 S.W.3d 671
   (Tex. App—Corpus Christi 2003, pet. denied) ......... 35, 36, 37, 38, 40, 41, 58, 68

*Pool v. Ford Motor Co.*,
   715 S.W.2d 629 (Tex. 1986) ......................................... 27, 32, 34, 46, 48, 62, 71

*Pulaski Bank & Trust Co. v. Texas Am. Bank/Fort Worth, N.A.*,
759 S.W.2d 723 (Tex. App.—Dallas 1988, writ denied) .....................................50

*Quality Infusion Care, Inc. v. Health Care Serv. Corp.*,
224 S.W.3d 369 (Tex. App.—Houston [1st Dist.] 2006, no pet.).......................27

*SAS Inst., Inc. v. Breitenfeld*,
167 S.W.3d 840 (Tex. 2005) ...............................................................................26

*Spolijaric v. Percival Tours, Inc.*,
708 S.W.2d 432 (Tex. 1986) ...............................................................................59

*State Farm Fire & Cas. Co. v. Morua*,
979 S.W.2d 616 (Tex.1998)..................................................................................38

*Tony Gullo Motors, I L.P. v. Chapa*,
212 S.W.3d 299 (Tex. 2006) ................................................................. 56, 59, 64

*Universal Health Servs., Inc. v. Renaissance Women's Group, P.A.*,
121 S.W.3d 742 (Tex. 2003) ...............................................................................26

*White v. Harrison*,
390 S.W.3d 666, 675-76 (Tex. App.—Dallas 2012, no pet.).............................45

*Williams v. Colthurst*,
253 S.W.3d 353 (Tex. App.—Eastland 2008, no pet.)................................. 30, 34

# RULES

TEX. R. APP. P. 25.1.................................................................................67

TEX. R. APP. P. 33.1(a)(1) ............................................................... 63, 66

TEX. R. APP. P. 38.1................................................ 33, 34, 49, 52, 66

TEX. R. APP. P. 38.1(i)...................................................................... 44, 64

TEX. R. APP. P. 38.2(a)(2)......................................................................51

TEX. R. APP. P. 38.2(a)(1)(B) ................................................................1

TEX. R. APP. P. 39.1................................................................................ ix

TEX. R. APP. P. 47.1................................................................................68

TEX. R. CIV. P. 166a(c).................................................................... 62, 66

TEX. R. CIV. P. 277 ...............................................................................56

## STATEMENT REGARDING ORAL ARGUMENT

Though Marinecorp's brief is voluminous, this case does not merit oral argument. Oral argument is unnecessary because: (a) the appeal is frivolous; (b) the dispositive issues have been authoritatively decided; (c) the facts and legal arguments are adequately presented in the briefs and record; and (d) the decisional process would not be significantly aided by oral argument. *See* TEX. R. APP. P. 39.1.

# ISSUES PRESENTED

## ISSUE ONE

Chopper and Outlaw Gave Marinecorp Written Notice of Each Default and Thirty Days to Cure Each of its Breaches of the Lease. The Lease Agreements Did Not Require Written Notice of Marinecorp's Defaults by Certified Mail, Return Receipt Requested.

## ISSUE TWO

After Marinecorp Breached the Implied Warranty of Suitability and Committed Deceptive Trade Practices in Regard to the Parking-Lot Lights, Leaking Roof, Electrical Wiring, and Air Conditioning, Chopper and Outlaw Country Lawfully Tried to Protect Their Investment by Continuing Under the Leases and Asking Marinecorp to Fix the Problems. The *Griffin* Rule is Inapplicable Under the Facts of This Case.

## ISSUE THREE

Sufficient Evidence Supported the Jury's Finding that Marinecorp Failed to Mitigate its Alleged Damages.

## ISSUE FOUR

Sufficient Evidence Supported the Jury's Verdict. The Jury was not Required to Conclude that Outlaw Country Delayed its Own Opening.

## ISSUE FIVE

The Trial Court Correctly Rejected Marinecorp's Proposed Jury Question Concerning Whether Outlaw Country Failed to Mitigate its Damages Because Neither the Law nor Evidence Supported such a Question in This Case.

## ISSUES SIX THROUGH EIGHT

Issues Six Through Eight Should be Overruled Because Sufficient Evidence Showed Marinecorp Committed Deceptive Trade Practices and Separately Breached its Written Lease Agreements with Chopper and Outlaw. The record does not show Chopper and Outlaw Country attempted to bring a Property Code wrongful-eviction claim under the DTPA.

## ISSUE NINE

The Trial Court's Modified Final Judgment Awarding Prejudgment Interest Should be Affirmed Because Issue Nine is Unpreserved for Appellate Review.

## ISSUE TEN

On Appeal, Marinecorp has not Shown Entitlement to Damages for Alleged Breach of Guaranty.

## ISSUE ELEVEN

The Trial Court did not Award Cumulative Damages for DTPA Violations and Breach of Contract.

## ISSUE TWELVE

On Appeal, Marinecorp has not Shown Entitlement to Damages for Alleged Breach of a Promissory Note.

## ISSUE THIRTEEN

Legally and Factually Sufficient Evidence Supports the Trial Court's Judgment Awarding Actual Damages.

IN THE COURT OF APPEALS
FOR THE FIRST JUDICIAL DISTRICT OF TEXAS
AT HOUSTON, TEXAS

NO. 01-14-00707-CV

MARINECORP INTERNATIONAL, LTD.,
Appellant,
v.

THE CHOPPER GROUP, LLC AND OUTLAW COUNTRY, LLC
Appellees.

On Appeal From the 80TH Judicial District Court,
Harris County, Texas, Cause No. 2012-23983

## APPELLEES, THE CHOPPER GROUP, LLC, BACKWOODS COUNTRY CLUB, LLC, TONY MILLER AND KYLE TONES' BRIEF

## STATEMENT OF FACTS[1]

### A.     Tony Miller's Testimony and Choppers Sports Bar & Grill[2]

Tony Miller is a construction contractor who wanted to open a bar and grill as an investment. (3 RR p. 131, l. 19-20). He intended to open Choppers Sports Bar and Grill, get it up and running successfully, and later sell the business. (4 RR p. 80, l. 4-10). Miller is sole owner of two companies, Appellee, The Chopper

---

[1] Appellees Chopper and Outlaw Country include this Statement of Facts pursuant to Texas Rule of Appellate Procedure 38.2(a)(1)(B). *See* TEX. R. APP. P. 38.2(a)(1)(B). This Statement of Facts is based on the evidence presented to the jury during the trial of this case.

In this brief, the reporter's record is cited in the following format: "[Volume Number] RR, p. [Page Number], l.[Line Numbers]", and trial exhibits are cited by their number and location in the record. The Clerk's Record is cited in the following format: "[Volume Number] CR [Page Number]. Marinecorp's brief is cited as needed in the following format: "MC Brief, P.[Page Number].

[2] The summary of the evidence concerning the establishment of Choppers Bar and Grill and Outlaw Country dance hall is based primarily on Tony Miller's trial testimony.

Group, L.L.C. (hereinafter "Chopper"), and Appellee, Backwoods Country Club, L.L.C. d/b/a Outlaw Country (hereinafter "Outlaw Country"). (3 RR p. 141, l. 7-p. 142, l. 1).

In Spring 2010, Miller first met and started working with commercial real estate broker Grady Lee Tibbs. (4 RR p. 147, l. 18-p. 148, l. 11). Tibbs searched for space Chopper could lease for Choppers Sports Bar and Grill. Tibbs showed Miller a restaurant space located at 18419 Kuykendahl that was available for lease. (4 RR p. 148, l. 9-11). If Chopper decided to lease the space, Marinecorp would pay Tibbs 4% of the rent from the lease as a commission for leasing the space. (5 RR p. 225, l. 16-24).

When Tibbs showed Miller the space, it was a former Marco's Mexican Restaurant that had sat vacant for about two years. (5 RR p. 230, l. 22-p. 231, l. 6). Yet, when Miller first saw the vacant space, the tables from Marco's Mexican Restaurant were still set and there was still food in the kitchen.[3] (3 RR p. 152, l. 10-15).

The space was 5,400 square feet in size and Chopper decided to lease it, remodel and clean it, and open for business. (3 RR p. 141, l. 11-18). The lease was executed on April 20, 2010, and working with a crew of twenty to thirty people, Miller had Choppers open for business within eight to ten weeks of signing

---

[3] Miller testified that when he first saw the kitchen space in the vacant Marco's Mexican Restaurant, it was "nasty." (3 RR p. 152, l. 3-9).

the lease. (3 RR p. 142, l. 9-p. 143, l. 20). Marinecorp fixed the leaking roof. (3 RR p. 171, l. 22-25). The space had no electricity because the interior and exterior electrical wiring had all been stripped away. (3 RR p. 153, 9-21). What remained of the interior electrical panel was damaged because rain had poured into it from the leaking roof. Miller hired an electrician and, within a month, all of the electrical wiring was restored and operational. (3 RR p. 142, l. 9-p. 143, l. 20).

Before opening, Miller also replaced most of the kitchen equipment, some of which was over twenty-five years old. (3 RR p. 152, l.17-p. 153, l. 1). Miller removed and rebuilt the bar and replaced the tables. Miller installed televisions and games for customer entertainment. (3 RR p. 157, l. 22-24). Vandals had stolen the air conditioning units for the space, so Miller paid an air conditioning company to restore air conditioning to the space after Marinecorp failed to do so. (3 RR p. 143, l. 21-p. 144, l. 11).

Choppers Sports Bar and Grill opened for business in mid-July 2010. Choppers was open daily for lunch and dinner and operated successfully in terms of Miller meeting his responsibilities. (6 RR p. 49, l. 11-15). But, early on, a serious problem became apparent; the parking-lot lights, for which Marinecorp was responsible under the lease, did not work. (3 RR p. 144, l. 12-p. 145, l. 11). The timing could not have been worse for Choppers—it was the start of the football season and Choppers was hoping to attract customers to watch football.

3

The dark parking lot posed a serious safety risk to Choppers' customers and employees. The dark parking lot cost Choppers business because prospective patrons did not want to watch events like Monday Night Football at a place with a "scary" parking lot. Miller complained constantly to Marinecorp about the lack of parking-lot lights. (3 RR p. 145, l. 4-p. 147, l. 8). Miller complained by phone, text, and in person at Marinecorp's office. (3 RR p. 145, l. 4-p. 147, l. 8). He primarily voiced his complaints to Mike Mirza, the property manager Marinecorp had assigned to the shopping center. (9 RR pp. 7-8; p. 77; PX 3, text messages from Miller to property manager complaining about lights and loss of football customers).

Marinecorp had its maintenance man, Louis, try to fix the parking-lot lights and never hired an electrician to fix the lights. (3 RR p. 170, l. 14-22). Rather than fixing the problem within a couple of days by hiring a licensed electrician, around September 12, 2010, Marinecorp had a new meter installed and then placed temporary generators and lighting in the Choppers parking lot. (6 RR p. 36, l. 25-p. 37, l. 7; 3 RR pp. 144-145; 3 RR p, 171, l. 3-9). These did not supply the same amount of light as normal parking-lot lights, and Miller had to refill the diesel fuel in the generators every other day, at his own expense. In October 2010 and even into February 2011, Choppers continued to complain by text message to

Marinecorp's property manager that the parking lot lights were not working and it was losing customers as a result. (9 RR pp. 7-8, 77).

Miller also testified that there was a manhole with a missing cover outside of Choppers. It was near the dumpster and the cover was missing since April 2011. Miller feared a child could fall into the hole, down into a sewage line. He reported it to Marinecorp, but even though it was in a common area, Marinecorp would never cover it. In fact, Marinecorp told Miller to cover it. So, Miller made a conscious effort to keep it covered with a piece of wood. Miller testified the manhole still lacked a cover at the time of trial, long after Choppers had closed down. (3 RR p. 168, l. 6-23).

## B. The Second Lease – Outlaw Country

Marinecorp closely monitored Miller's progress in remodeling and opening Choppers. Marinecorp had an office nearby in The Woodlands, so they would send someone to the property almost daily to monitor the renovation of the Choppers lease space. Shortly after Choppers opened, during the summer of 2010, the property manager, Mirza, approached Miller about whether he would lease and renovate the vacant Walgreens in the same shopping center. The only reason Miller even considered leasing and renovating the second space was that Marinecorp adamantly promised it would fix the parking-lot lights Choppers

5

needed. Otherwise, Miller would not have considered working with Marinecorp on a second project. (3 RR pp. 145-147).

The former Walgreens space was 10,998 square feet in size and had been vacant for eight years.[4] There was scattered insulation and mold in the space. The floor needed to be replaced and the roof leaked extensively, even into the electrical room. The electricity could not work (in part because copper thieves had stolen the wiring) and the air conditioning units had been stolen. (3 RR p. 148, l. 2-12).

Miller was interested in leasing the space to operate a country and western dance hall and concert venue that would open primarily on the weekends. (3 RR p. 49, l. 16-19). As with Choppers, Miller's intent was to remodel the space, start a successful business, and then sell it. But Miller could not agree to lease the space as-is. The renovation would cost approximately two million dollars, and even with the financial help of an investor, Kyle Tones, Miller could not fund the entire renovation up front, out-of-pocket. (3 RR p. 161, l. 22-p. 162, l. 20). So, acting through broker Bud Tibbs, Miller negotiated a lease with Marinecorp under which Marinecorp would: (1) fix the leaking roof; (2) supply 1,000 amps of electrical capability to the space; and (3) provide 60 tons of working air conditioning. (3 RR p. 149, l. 1-p. 151, l. 14).

---

[4] Tibbs and Miller testified the former Walgreens had been vacant for eight years. Mirza initially testified it had been vacant for three years, then testified it had been vacant for four or five years. (5 RR p. 234, l. 16-18; 6 RR p. 35, l. 10-25).

Miller agreed to "build out" and renovate the former Walgreens space under a strict three-phase construction schedule Marinecorp required.[5] The parties agreed that if Miller complied with the three-phase construction schedule, Marinecorp would advance Miller approximately $166,000 toward the renovation, but Outlaw Country would have to repay this amount in the form of increased rent payments during the life of the lease. (3 RR p. 162, l. 4-20).

The Outlaw lease was executed on September 28, 2010. But ten days before the lease was even signed, Miller and about eleven other men began the renovations, just to keep up with the three-phase construction schedule and meet the November 1, 2010 commencement (opening) date set forth in the lease. (3 RR p. 159, l. 2-p. 160, l. 22). After the lease was signed, Miller had thirty to forty people working under him to renovate the space on schedule, which they did. (3 RR p. 160, l. 25-p. 161, l. 23). Among other things, Miller and his crew replaced the flooring, removed the pharmacy wall, added a bar and DJ booth, and added office and storage space (needed for beverages and live-show equipment). (3 RR p. 154, l. 16-24). They also created a 2,000 square foot dance floor, one of the largest in the Houston area, and bathrooms that "met code" for 1,000 person occupancy. (3 RR p. 155, l. 12-p. 156, l. 4; p. 166, l. 12-p. 167, l. 17). As

---

[5] During the Outlaw Country lease negotiation, Marinecorp had Miller, a contractor by trade, submit plans for a three-phase build construction schedule of the former Walgreens. A copy of the plans is in the record. (9 RR p. 3; PX 2). Marinecorp inspected the property at the conclusion of each construction phase to see that the work was completed. (3 RR p. 161, l. 13-23).

renovated by Miller, the former Walgreens was suitable for hosting concerts, wedding receptions, and even conventions, and such events were scheduled to begin in November 2010. (3 RR p. 135, l. 19-23; pp. 156, 180).

But Outlaw Country met a significant hurdle—Marinecorp did not meet its obligations under the lease to repair the leaking roof, provide electrical capability, and sixty tons of air conditioning. This resulted in significant business losses for Outlaw Country, including three failed grand openings for which major musical acts had been scheduled and advertised. (5 RR p. 8, l.4-p. 9, l. 20).

## C.    The Unrepaired Roof at Outlaw Country

Every time it rained, "it was a mess" inside of Outlaw Country. (3 RR p. 164, l. 5-10). Miller and Tibbs complained to Mirza by text and email. (5 RR p. 33, l. 11-22). They even complained about the roof in person at the Marinecorp office. Miller obtained several bids for necessary roof repairs but Marinecorp would not have the roof work done. The property manager, Mirza, referred Miller to a roof repairman named Oscar, claiming Marinecorp had hired Oscar to repair Outlaw Country's roof. But when Miller contacted Oscar, he learned that Marinecorp had only paid Oscar $600 for roof repairs and Oscar refused to perform any further repairs without additional pay.[6] So, Miller even tried to patch

---

[6]    Oscar told Miller he had already visited the Outlaw Country roof six times for the $600 payment from Marinecorp. (3 RR p. 163, l. 17-p. 164, l. 4).

some of the roof himself, but major repairs were necessary. (3 RR p. 163, l. 17-p. 164, l. 11).

On December 29, 2010, a particularly bad roof leak occurred at Outlaw Country. Rain poured down onto a stage Miller had recently installed, and the building's interior electrical panel was "full of [rain] water." Rain ran down an interior wall. Miller had to place a horse trough and five-gallon buckets inside of Outlaw Country to try to catch the rain pouring in through the roof. The water leaking through the roof pulled insulation into the space. A piece of conveyor belt that had been affixed to the roof with tar gave way and Miller realized "repairs" had been made using items that were "not roofing material." Miller took photos of this leak incident and sent them to Mirza the same day. (3 RR p. 158, l. 16-23). But Marinecorp still never repaired the roof and it remained unrepaired at the end of 2012 and at the time of trial. (3 RR p 164, l. 16-p. 165, l. 25).

## D. Marinecorp's Failure to Timely Provide Electrical Hookups at Outlaw Country

Miller finished his renovation of Outlaw Country on time and expected Marinecorp to timely install the electrical hook-ups by the November 1 absolute deadline. In October 2010, Miller applied for electrical service from Green Mountain Energy, only to find out Outlaw Country could not yet receive electricity

because Marinecorp still had not installed any electrical hook-ups.[7] (3 RR p. 172, l. 9-p. 174, l. 24; PX 74).

Marinecorp's electrician, Jim Hofelich, whom Miller had used successfully for smaller projects, had great difficulty establishing hook ups for 1,000 amps of electricity at Outlaw Country. It took Hofelich months to complete the job because Marinecorp ordered the wrong parts and two or three times when Hofelich thought the job was completed, CenterPoint Energy came out to inspect and would not approve Hofelich's work. Throughout the process, Miller complained by text, email and in-person at Marinecorp's office, but Marinecorp was not concerned about the delay. Outlaw Country did not have working electricity until January 24, 2011. (3 RR p. 172, l.9-p. 180, l. 1).

The electrician, Hofelich, testified candidly at trial and corroborated Miller's testimony. Hofelich did a fair amount of work for Marinecorp and his wife was a teacher in the Nasser[8] family's Montessori school, located in the same shopping center as Choppers and Outlaw Country. (5 RR p. 166, l. 12-18). Hofelich testified it had been four or five years since he had "built an electrical service" for a space and that doing so for Outlaw Country was entirely his responsibility as Marinecorp had hired him to do so. (5 RR p. 191, l. 1-18; p. 194, l. 7–22).

---

[7] The lack of electricity during the Outlaw Country renovation posed a large problem for Miller. He had to run electricity from his Chopper space to Outlaw Country so he could renovate. Marinecorp was aware of this, but still failed to timely deliver electrical capacity. (3 RR p. 178, l. 2-p. 179, l. 3).

[8] The Nasser family owns Marinecorp.

10

Hofelich testified that while he first attempted the work the latter half of October 2010, and initially invoiced Marinecorp for the electrical hook-ups at Outlaw Country in November 2010, CenterPoint Energy soon came out and refused to approve his work for use. (5 RR p. 177, l. 7-p. 179, l. 5).

Hofelich testified that he notified Marinecorp's property manager, Mirza, of this and discussed the issue with Mirza because this was work he was performing for Marinecorp, not Miller. Hofelich's next attempt was likewise rejected by CenterPoint until January 2011. (5 RR p. 179, l. 2-p. 182, l. 22; p. 183, l. 16-21).

**E.      Marinecorp's Failure to Timely Provide the Sixty Tons of Air Conditioning**

To make the office space in Outlaw Country usable, Miller had an air-conditioning technician set up one unit by mid-October. Marinecorp, which was responsible for providing 60 tons of air conditioning to the space, had large units installed in late 2010, (3 RR p. 184, l. 3-8).

Marinecorp hired a licensed a/c contractor, Thon Dang, to install the four a/c units on top of the Outlaw Country roof. Dang testified he expressly excluded connection of the units to high voltage from his written bid to Marinecorp. That is an electrician's work. Accordingly, about a week after he installed the units, in November 2010, there was a test meeting at the space with Dang and Marinecorp. The a/c units were connected to voltage and they worked properly. (5 RR p. 120, l. 1-p. 127, l. 9; p. 133, l. 1-p. 136, l. 25).

11

As Outlaw Country still lacked electrical hooks ups, electricity from Marinecorp's common-area parking-lot meter was used to conduct the test. Hofelich testified he never connected or disconnected the a/c units to electricity and that he saw Marinecorp's maintenance man, Louis, working with an electrician on doing so. (5 RR p. 195, l. 21-p. 196, l. 25).

In February 2011, Tones and Miller organized a third grand opening at Outlaw Country. They spent just under $25,000 to book country singer Tracy Lawrence along with other bands. (3 RR p. 184). Although about 800 people arrived for the February 19 grand opening, over half of them left before Lawrence even took to the stage because the venue was unbearably hot. (3 RR p. 184, l. 16-22).

Miller reported to Marinecorp that the a/c was not working. He texted Mirza, called the company president Nasser, and complained in person at Marinecorp's office. After a couple of days, when Marinecorp had still not repaired the problem, despite promising to do so, Miller hired an a/c company, Durwood A/C, to diagnose the problem. Durke Turner from Durwood went on the roof and discovered three of the four a/c units were not connected to any electrical source. (3 RR p. 185, l. 2-p. 186, l. 22). Turner testified at trial, by deposition, and his testimony corroborated Miller's. (5 RR pp. 48-60).

Miller's testimony about Marinecorp's conduct was also corroborated by the real-estate broker Marinecorp paid, Grady Tibbs, and by Kyle Tones, the investor who sued Miller after Choppers and Outlaw Country closed, following the lockout.

## F. Testimony of Realtor Tibbs: The Lockout and Marinecorp's Use of Miller

At the time of trial, Grady "Budd" Tibbs had been a commercial real estate broker for twenty years. He had no stake in the lawsuit, but if he displeased Marinecorp he stood to lose future business opportunities. Tibbs testified that it was his usual practice after a space leased, to follow up with all parties to ensure their satisfaction. (4 RR p. 147, l. 1-p. 149, l. 25).

Tibbs participated in the lease negotiations for Choppers and Outlaw Country. In regard to Choppers, Tibbs testified that the need for high-volume parking was a negotiated lease term and Mirza represented the parking-lot lights and a large, lit pylon sign advertising Choppers to passing traffic would be fixed "ASAP." Mirza represented these items would be completed during the renovations, before Choppers was ready to open for business. Tibbs complained daily to Mirza about the lack of progress on these items, and while Mirza would promise to make the needed repairs right away, nothing would happen. Tibbs testified the light on the Choppers sign was never fixed. (4 RR p. 149, l. 1-p. 151, l. 10; p. 152, l. 14-15).

Tibbs testified further that the unlit Choppers parking lot was "very dark" and "scary." It was definitely "bad for business." "Ultimately," Marinecorp placed "cheap looking" construction-site lighting with two big generators in the Choppers parking lot, but this did not provide the same amount of illumination as customary parking-lot lighting. (4 RR p. 152, l. 14-p. 154, l. 25). Tibbs testified that having Marinecorp's under-qualified maintenance man, Louis, trying to fix the parking-lot lights was an impediment to resolving the problem efficiently. (4 RR p. 155, l. 1-9).

In terms of the Outlaw Country lease, Tibbs testified that it was negotiated that Marinecorp would get the roof repaired and power capability restored "ASAP." These items were of paramount importance. All of the building's internal and external wiring had been stripped out. Miller needed power to renovate the space. Tibbs testified that as part of the lease negotiations, Mirza represented to Miller that he would complete the roof and power work "immediately." The absolute completion deadline under the lease would have been the November 1, 2010 commencement date. (4 RR p. 154, l. 2-5 RR p. 8, l. 4).

At trial, Tibbs believed the roof had still not been repaired and recalled there was always a leak "where the power box came into the space." Tibbs testified that because of the roof and electrical issues, Outlaw Country's grand opening was

14

canceled at least three times despite Outlaw Country scheduling performers like Mark Chestnut and John Cassidy for the grand openings. Outlaw Country had even run radio advertisements for the grand openings. (5 RR p. 7, l. 1-p. 12, l. 25).

Tibbs believed Choppers and Outlaw Country ultimately failed because of Marinecorp. The unlit parking lot at Choppers and the canceled grand openings at Outlaw Country were bad for business. When Outlaw Country finally hosted a grand opening in February 2011, 800 to 900 people arrived for a Tracy Lawrence concert, but they left in droves when it became apparent the air conditioning was not functioning.

Tibbs described Miller's renovations of the lease spaces as a "tremendous conversion." He estimated the improvements of Outlaw Country alone were worth "a couple of million dollars." Tibbs testified that the space was "very, very nice" and Miller's renovations made the other spaces in the shopping center more leasable. (5 RR p. 14, l. 17-p. 15, l. 2).

After the buildouts were complete, Miller had multiple prospective buyers of the businesses. Assumability of the lease was a key issue, but each time a prospective buyer spoke with Mirza, s/he seemed to lose interest in the purchase. (5 RR p. 15, l. 3-p. 17, l. 14).

Tibbs testified that leading up to the lockout in January 2012, Marinecorp would keep changing the rent amounts allegedly due, so that no matter how much

Miller tendered, Marinecorp always accused Chopper and Outlaw of being in default for failure to pay rent. Tibbs traveled to Marinecorp's offices with Miller multiple times and witnessed firsthand the changing rent amounts. (5 RR p. 18, l. 1-p. 20, l. 25).

Tibbs testified further that Mirza was not concerned about the delays Marinecorp caused Miller in opening Outlaw Country. To Tibbs's surprise, when he raised the subject with Mirza, Mirza responded, 'Well, we never anticipated for them to make it.' Tibbs testified that nothing Miller did seemed "good enough" for Marinecorp after the renovations were completed. Tibbs believed Marinecorp did not want Miller in business at the shopping center and did everything possible to get rid of him. Tibbs testified he had never before seen anything like this in his career. (5 RR p. 14, l. 1-p. 15, l. 25; p. 21, l. 1-6).

## G.    Testimony of Investor Kyle Tones

Tones knew Miller from prior projects and was an investor in Choppers and Outlaw Country. (6 RR p. 114, l. 1-4). Tones provided corroborating testimony concerning the problems with the parking-lot lights at Choppers, and the a/c, electricity and roof at Outlaw Country. (6 RR p. 121, l. 22-p. 129, l. 11). Tones testified that in addition to providing capital for the build outs, Miller physically worked day and night on the build outs. (6 RR p. 129, l. 17-p. 132, l. 25).

Tones, like Tibbs, confirmed that nothing Miller did delayed the electrical service to Outlaw Country. (6 RR p. 132, l. 3-25). The first and second grand openings had to be moved to Choppers because of the lack of electricity at Outlaw Country. (6 RR p. 130, l. 5-p. 132, l. 25). Miller pushed very hard for both businesses to survive. Tones testified that Marinecorp, as a landlord, needed to be held "accountable." (6 RR p. 126, l. 3-11).

## H.    Testimony of Marinecorp's Property Manager Mike Mirza

Michael "Mike" Mirza is a property manager. He testified that his employer was Zenith Real Estate (a family company, related to Marinecorp), but he worked as a property manager for Marinecorp. Mirza testified he was involved in negotiating the leases with Chopper and Outlaw Country, and after oral agreements were reached, he reduced the agreements to writing. As property manager, Mirza was responsible for the daily management of the shopping center, including being certain that "vendors" Marinecorp hired to perform work at the property did so. Mirza added that his job is to make sure the tenants were comfortable and things were running smoothly. (5 RR, p. 220, l. 15-p. 224, l. 24).

Ayaz Nasser, the President of Marinecorp, testified that Mirza was a good property manager whom he did not fault in this case. (6 RR p. 62, l. 17-22; P. 75). Mirza and Nasser met regularly to discuss the status of the various Marinecorp properties.

17

Mirza first met the real estate broker, Tibbs, in May 2010. Mirza testified that Tibbs showed the space in the shopping center to other clients before bringing Miller to see it. Mirza testified that Miller accepted the Choppers space as-is and Miller paid out of his own pocket to renovate it. (5 RR p. 220-p. 224, l. 13). Miller worked with CenterPoint Energy to turn on electricity in the space using a new meter. Mirza acknowledged the parking-lot lights did not work at Choppers Sports Bar and Grill, but testified he believed the street lights and lighting from a nearby Burger King and neighboring shopping center were supplying light. On cross-examination, Mirza admitted the lights in the surrounding area were inadequate to satisfy Marinecorp's duty to provide parking-lot lights for Choppers. Mirza believed an underground wiring problem caused the outage. Mirza admitted the Choppers parking-lot lights were completely out for at least five or six weeks while a workman tried to diagnose the cause of the outage. (6 RR, p. 31, l. 21-p. 35, l. 25).

On cross-examination, Mirza conceded the parking-lot lights could not have been fully functional even after five or six weeks because Marinecorp did not have a functioning meter in place for this common-area space until mid-September. (6 RR p. 32, l. 21-p. 33, l. 7). Mirza testified he is not an electrician and he could not answer why it took more than a couple of days to restore the parking-lot lights. (6 RR p. 37, l. 15). Mirza testified that he promised Miller he would get the parking-

lot lights working and that he knew Miller relied on his representation, particularly in considering whether to renovate Marinecorp's former Walgreens space. (6 RR p. 30, l. 18-p. 31, l. 9).

According to Mirza, after Choppers opened in July 2010, Tibbs approached Mirza about Miller renovating and leasing the former Walgreens space for Outlaw Country, a dance hall. Mirza testified the former Walgreens space was "in good condition" when Marinecorp leased it to Outlaw Country. Mirza "didn't see anything wrong with it." But, when questioned further, Mirza conceded the floors needed to be replaced, the air conditioning units had been stolen, and there was no power in the space. (5 RR p. 232, l. 2-p. 235, l. 25).

Mirza acknowledged that under Outlaw Country's lease of the vacant Walgreens space, Marinecorp agreed to provide 1,000 amps of electrical capability, sixty tons of air conditioning, and to fix the leaking roof. While the space was nearly 11,000 square feet in size, Mirza testified that Marinecorp paid Oscar $600 to fix the entire roof and Oscar did so. (6 RR p. 38, l. 20-25).

As to the electricity at Outlaw Country, Mirza testified that electrician Jim Hofelich tendered him an invoice on November 8, 2010 and Mirza believed that as of that time, 1,000 amps of electricity had been hooked up. Mirza testified he first learned of any electrical problem in the courtroom at trial. Mirza denied that Miller ever emailed, texted or sent a letter mentioning any delay hooking up the

19

electricity as represented.[9] (6 RR p. 39, l. 24-p. 41, l. 25). Mirza testified that although Hofelich testified that from the end of November through early January, he was in Mirza's office regularly and communicating with Mirza daily about the problems hooking up electricity at Outlaw Country, this did not happen. (6 RR p. 13, l. 24-p. 14, l. 4).

Concerning the 60 tons of air-conditioning at Outlaw Country, Mirza testified that at the test hook-up in November 2010, the air conditioning worked. Mirza testified he did not know what happened to cause the units to become disconnected from the power source between the test and February 2011. Mirza testified that had he known the a/c units were not hooked up to a power source, he would have repaired the problem. On cross-examination, Mirza admitted that the a/c units had been tested by hooking them up to the electrical source for the parking lot lights, for which Marinecorp paid. Marinecorp would not allow Outlaw Country to run its a/c using its parking-lot electricity. Outlaw Country had no electrical hook up at the time, so its electricity could not have been used to test the function of the a/c units. (6 RR p. 45, l. 6-p. 46, l. 23).

Mirza testified that he knew Miller was planning a grand opening for Outlaw Country during the 2010 Thanksgiving holiday and when that failed, Miller

---

[9] Mirza testified that while Miller had construction ongoing in the lease spaces, he and Miller spoke daily at the work sites. Mirza also testified generally that he received a few emails and texts from Miller, and that Miller and Tibbs complained in person a few times at Marinecorp's offices.

attempted a New Year's Eve grand opening that was also unsuccessful. Mirza insisted that Marinecorp completed all of its work due under the Outlaw Country lease agreement by November 8, 2010. But he acknowledged that, on behalf of Marinecorp, he gave Outlaw Country two months' "free" rent after the problems delayed their grand openings.[10] (6 RR p. 56, l. 14-p. 59, l. 8; p. 66, l. 15-p. 67, l. 25).

## I.   Testimony of Marinecorp's Corporate Representative Ed Wolochin

Wolochin is a Senior Property Manager at Marinecorp. He acknowledged that Tibbs and Miller came to his office to complain on at least two occasions. (5 RR p. 80, l. 23-p. 81, l. 6). Wolochin testified that Choppers was usually current on its rent payments, and that it was even current on its rent at the end of 2011 before the January lockout. (6 RR pp. 85-86). He admitted there were sometimes mistakes in in calculating the rent amounts owed, but testified they were corrected. (5 RR p. 82).

Wolochin described the Outlaw Country business as healthy when a couple, the Harlesses, attempted to take it over. (5 RR p. 96). After that point, Wolochin described alleged difficulty collecting rent. Wolochin testified that after the

---

[10] Miller testified that Marinecorp recouped "free" rent amounts by increasing rent amounts due later in the life of the lease agreement. With the two months' additional free rent, Outlaw Country's first rent payment would be due in June 2011, instead of April 2011.

January 2012 lockout, he does not recall Miller bringing the Outlaw Country rent fully current. (5 RR pp. 86-89).

## J. The Re-Finance and Marinecorp's Reluctance to Lease to Alcohol Vendors

Wolochin testified that he believed a member of the Nasser family opposed Outlaw Country and Chopper selling liquor in the shopping center. (5 RR p. 102, l. 1-p. 103, l. 22). Marinecorp's President, Nasser, testified candidly that his family owns Marinecorp and their beliefs do not permit alcohol consumption. (6 RR p. 71, l. 8-15).

Nasser also testified that the renovations Miller provided made the shopping center look good. With the renovations, the family was able to refinance the shopping center using a major bank, Wells Fargo, instead of having a related family company hold the note for the shopping center. (6 RR pp. 64, 72-73).

## K. The Jury's Verdict

The jury found Marinecorp breached its contract with Chopper and Outlaw Country, and that while Outlaw Country also breached its contract, Marinecorp breached first. (1 CR 403-408). Marinecorp was awarded no damages for breach of contract. Though the jury awarded Chopper and Outlaw Country damages for breach of contract, the trial court did not enter judgment for these damages. (1 CR 409).

The jury also found Marinecorp breached its implied warranty of suitability for both leases and knowingly violated the Texas Deceptive Trade Practices Act ("DTPA") in dealing with Chopper and Outlaw. (1 CR 417-419). In its Modified Final Judgment, the trial court entered judgment for actual damages for Chopper of $210,000 and Outlaw Country of $290,000. (1 CR 590). Outlaw and Chopper were also awarded $11,000 each for the knowing DTPA violation and attorney's fees, plus prejudgment interest.

## SUMMARY OF THE ARGUMENT

From the outset, when Chopper and Outlaw Country called the first witness at trial, this case turned on the credibility of the witnesses for each side. By its verdict, the jury found Chopper and Outlaw Country's case credible and disbelieved the defense. The trial court properly entered judgment on the verdict and this honorable court should affirm the trial court's Modified Final Judgment because Marinecorp has not demonstrated reversible error on appeal.

Specifically, the evidence is factually and legally sufficient to support the trial court's judgment on liability and damages (Issues 3, 4, 6, 8, 13). The evidence shows Chopper and Outlaw Country complied with the lease language requiring them to give Marinecorp 30 days' notice of its defaults under the lease agreements (Issue 1).

Whether analyzed under warranty law or contract law, Chopper and Outlaw did not waive their claims against Marinecorp by trying to resolve their differences with Marinecorp instead of hastily abandoning their leases. The *Griffin* rule is inapplicable because landlord-tenant law allows a tenant to protect his investment by trying to resolve differences with a landlord before seeking rescission (Issue 2).

The law and evidence supported the trial court's submission of a jury question on whether landlord Marinecorp mitigated its damages after locking Chopper and Outlaw Country out of their lease spaces (Issue 3). The law and evidence did not support a submission on whether Outlaw Country mitigated its damages because Marinecorp's breach had not yet occurred at the time Marinecorp identifies as a mitigation opportunity (Issue 5). Marinecorp cannot use a mitigation argument to shift its contract and warranty responsibility to provide electricity.

There was no violation of the one-satisfaction rule in this case. The evidence showed separate DTPA violations and breach of contract, and the trial court only entered judgment awarding actual damages for DTPA violations (Issue 11). Finally, several issues presented are waived or moot (Issues 7, 9, 10, 12).

## ARGUMENT AND AUTHORITIES

## ISSUE ONE (RESTATED)

Chopper and Outlaw Gave Marinecorp Written Notice of Each
Default and Thirty Days to Cure Each of its Breaches of the Lease.

24

The Lease Agreements Did Not Require Written Notice of Marinecorp's Defaults by Certified Mail, Return Receipt Requested.

By its first issue, Marinecorp erroneously argues that Chopper and Outlaw failed to comply with the lease requirement of giving Marinecorp thirty days' written notice of any default under the lease and an opportunity to cure. Both Miller and Tibbs testified that they complained constantly about the lack of parking-lot lights at Choppers, and Marinecorp's failure to timely provide electrical hook-ups, roof repairs, and sixty tons of air-conditioning at Outlaw Country. Miller and Tibbs complained to the property manager by text and email, and in-person, multiple times at Marinecorp's corporate offices. The record shows that more than thirty days elapsed after the notice and Marinecorp did not address its default in these key areas.

The unambiguous lease language did not require Chopper and Outlaw Country to provide written notice to Marinecorp by certified mail, return receipt requested. By its verdict, the jury rejected Marinecorp's President's testimony that while Mirza was a good property manager, Marinecorp never realized or had it brought to Nasser's attention that Chopper and Outlaw Country believed Marinecorp defaulted and wanted the necessary repairs made.

## A. De Novo Standard of Review Applies to Contractual Notice Clause

Whether a contract is ambiguous is a question of law for the court. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996); *Chapman v. Abbot*, 251 S.W.3d 612, 616-17 (Tex. App.—Houston [1st Dist. 2007, no pet.). If the contract is so worded that it can be given a definite legal meaning or interpretation, then it is not ambiguous, and a court should construe the contract as a matter of law. *SAS Inst., Inc. v. Breitenfeld*, 167 S.W.3d 840, 841 (Tex. 2005); *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997); *Chapman*, 251 S.W.3d at 616-17. An appellate court construes an unambiguous contract according to the plain meaning of its express wording. *Lyons v. Montgomery,* 701 S.W.2d 641, 643 (Tex. 1985; *Chapman*, 251 S.W.3d at 616-17. Unambiguous contracts are enforced as written. *Heritage Res., Inc.,* 939 S.W.2d at 121.

"A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation." *Id.* An appellate court determines whether a contract is ambiguous by looking at the contract as a whole in light of the circumstances present when the parties entered the contract. *Universal Health Servs., Inc. v. Renaissance Women's Group, P.A.*, 121 S.W.3d 742, 746 (Tex. 2003); *Chapman*, 251 S.W.3d at 616-17. When a contract contains an ambiguity, either patent or latent, the interpretation of the instrument becomes a fact issue. *Coker v. Coker,* 650 S.W.2d 391, 394 (Tex. 1983); *Quality Infusion*

*Care, Inc. v. Health Care Serv. Corp.,* 224 S.W.3d 369, 379 (Tex. App.—Houston [1st Dist.] 2006, no pet.). The fact finder must resolve the ambiguity by determining the true intent of the parties. *Coker,* 650 S.W.2d at 394-95; *Chapman,* 251 S.W.3d at 616-17.

## B. Standard of Review for Legal and Factual Sufficiency

When reviewing the legal sufficiency of the evidence, an appellate court considers the evidence in the light most favorable to the challenged finding and indulges every reasonable inference that would support it. *City of Keller v. Wilson,* 168 S.W.3d 802, 823 (Tex. 2005). The court credits favorable evidence if a reasonable factfinder could and disregards contrary evidence unless a reasonable factfinder could not. *See id.* at 827. The reviewing court considers whether the evidence at trial would enable reasonable and fair-minded people to find the facts at issue. *See id.* The factfinder is the only judge of witness credibility and the weight to give to testimony. *See id.* at 819.

When reviewing the factual sufficiency of the evidence, an appellate court examines the entire record, considering both the evidence in favor of and contrary to the challenged finding. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). After considering and weighing all the evidence, the court sets aside the fact finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986).

27

Under this standard, the trier of fact is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *GTE Mobilnet of S. Tex. v. Pascouet*, 61 S.W.3d 599, 615-16 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).

## C.      Chopper and Outlaw Country Satisfied the Notice Clause

Sufficient evidence in the trial record shows that Chopper and Outlaw Country gave Marinecorp timely notice of its defaults under the lease and at least thirty days to cure. In support of its first issue on appeal, Marinecorp relies on the following lease sections, including section 21.1 which references written notices sent to a particular address by certified mail, return receipt requested for giving deemed notice:

> Section 17.11. In the event of any default by Landlord, Tenant's exclusive remedy shall be an action for damages (Tenant hereby waiving the benefit of any laws granting it a lien upon the property of Landlord and/or upon rent due Landlord), but prior to any such action Tenant will give Landlord written notice specifying such default with particularity, and Landlord shall thereupon have a reasonable period, but in no event less than thirty (30) days, in which to cure any such default, provided, however, if Landlord's default is of such a nature that it cannot reasonable [sic] be cured within said thirty (30) day period then Landlord will not be deemed to be in default hereunder if Landlord has promptly commenced to cure said default and is diligently attempting to cure the same. Unless and until Landlord fails to so cure any default after such notice, Tenant shall not have any remedy or cause of action by reason thereof. All obligations of Landlord hereunder will be construed as covenants, not conditions;

28

and all such obligations will be binding upon Landlord only during the period of its possession of the Shopping Center and not thereafter.

NOTICES

Section 21.1. Wherever any notice is required or permitted hereunder such notice shall be in writing. Any notice or document required or permitted to be delivered hereunder shall be deemed to be delivered whether actually received or not when deposited in the United States Mail, postage prepaid, Certified Mail, Return Receipt Requested, addressed to the parties hereto at the respective addresses set out in Section l.l(c) and l.l(f) above, or at such other addresses as they may hereafter specify by written notice delivered in accordance herewith.[11]

On its face, the first sentence of Section 21.1 of the lease agreements mandates that required notices be made in writing, such that oral notice does not necessarily satisfy the notice requirements under the leases. *See e.g.*, *Besteman v. Pitcock*, 272 S.W.3d 777, 784 (Tex. App.—Texarkana 2008, no pet.)(holding that

---

[11] In its brief, Marinecorp also cites section 3.1 of the lease to support its 30 days' written notice argument. (MC Brief, p. 17). However, on its face, Section 3.1 does not address notice:

Section 3.1. If this Lease is for a portion of the Shopping Center already constructed, Tenant acknowledges that it has, prior to the execution hereof, inspected the Demised Premises, that Landlord's work is completed (expect as may be otherwise expressly provided in Exhibit C attached hereto), and that Tenant has accepted the Demised Premises in its "AS-IS" condition, it being agreed that Landlord shall have no liability or responsibility for defects in the Demised Premises, including latent defects. By occupying the Demised Premises, Tenant shall be deemed to have accepted the same and to have acknowledged that the same fully comply with Landlord's obligations and covenants hereunder, as shown on Exhibit C.

In the Outlaw Country lease, at the end of Section 3.1, the parties added the following language: EXCEPT FOR ELECTRICAL SERVICE SHALL REMAIN AT 1,000 AMPS AND INSTALLED BY LANDLORD, HVAC AT 60 TONS.

a mandatory written-notice provision could not be expanded to allow for oral notice without rendering the written-notice provision meaningless).  Marinecorp's reliance on *Cheung-Loon L.L.C. v. Cergon, Inc.*, 392 S.W.3d 738, 745 (Tex. App.—Dallas 2012, no pet.), is misplaced because the restaurant-tenant in that case only gave oral notice of default to its parking-lot lessor, when the contract required written notice and thirty days' opportunity to cure.

In this case, the remainder of Section 21.1 sets forth a deemed-notice provision whereby notice can be established using prepaid certified mail (return receipt requested), even absent actual notice.  *See Akin v. Santa Clara Land Co., Ltd.*, 34 S.W.3d 334, 343-44 (Tex. App.—San Antonio 2000, pet. denied)(finding deemed notice in a landlord-tenant case that involved a very similar notice clause to Section 21.1).  But no language in Section 21.1 makes the prepaid certified mail (return receipt requested, to the address set forth in the lease) the exclusive means of written notice allowed under the lease.  Email and texts can be used to provide written notice required under real-estate contracts, so long as their content supplies the requisite information.  *See e.g., Nguyen v. Woodley*, 273 S.W.3d 891, 898 (Tex. App.—Houston [14th Dist.] 2008, no pet.)(holding email constituted written notice that terminated a real-estate contract); *Williams v. Colthurst*, 253 S.W.3d 353, 359 (Tex. App.—Eastland 2008, no pet.)(recognizing written amendment of lease

30

agreement could be made by email exchange, but concluding emails exchanged did not show a meeting of the minds).

In this case, the jury heard evidence from Marinecorp and Chopper/Outlaw Country on the notice issue, and by its verdict, the jury demonstrated that it found Chopper and Outlaw Country's evidence more credible than Marinecorp's. Though Section 21.1 of the lease did not even require actual notice, Miller's testimony that he complained in-person at Marinecorp's offices of the major defaults (electrical capacity, air-conditioning, parking-lot lights, roof leaks) was evidence of actual notice. Miller also testified unequivocally that he made these same complaints by text and email to property manager Mirza in the hope of just getting the problems fixed. Miller even sent Mirza photographs of the leaking roof at Outlaw Country, but the roof was never fixed.

Tibbs and Tones corroborated Miller's testimony that Miller repeatedly used texts and emails to provide written notice to Marinecorp of its defaults under the lease, but Marinecorp did not remedy the issues despite promising to do so. Marinecorp's property manager Mirza even admitted he received texts and emails from Miller, and confirmed that Miller came to the Marinecorp's offices multiple times to complain.

As to the air-conditioning units not being connected to an electrical source, after performing its test of all four units using electricity from its parking-lot meter,

Marinecorp apparently had three of the four units unhooked from any electrical source. Electrician Hofelich testified he did not unhook the a/c, but saw Marinecorp's maintenance man, Louis, working on the hook ups.

Marinecorp was the only party with motive to disconnect all but one of the units—it had a duty to provide an electrical hook up but did not want to pay for the only electricity available at the time, that from its parking-lot meter. So while the one hooked-up unit provided Miller air-conditioning for the office space in Outlaw Country, and provided the impression the air-conditioning was fully operable, Miller realized at an attempted third grand opening in February 2011 that Marinecorp had failed in its duty to connect the 60 tons of air conditioning to a power source. Miller reported to Marinecorp that the a/c was not working. He texted Mirza, called the company president Nasser, and complained in person at Marinecorp's office. (3 RR p. 185, l. 2-20).

Because there is legally and factually sufficient evidence that Chopper and Outlaw satisfied the notice requirements under the lease agreements, Marinecorp's first issue on appeal should be overruled. *See City of Keller,* 168 S.W.3d at 827; *Cain*, 709 S.W.2d at 176; *Pool*, 715 S.W.2d at 635.

## ISSUE TWO (RESTATED)

After Marinecorp Breached the Implied Warranty of Suitability and Committed Deceptive Trade Practices in Regard to the Parking-Lot Lights, Leaking Roof, Electrical Wiring, and Air Conditioning, Chopper and Outlaw Country Lawfully Tried to Protect Their

Investment by Continuing Under the Leases and Asking Marinecorp to Fix the Problems. The *Griffin* Rule is Inapplicable Under the Facts of This Case.

Jury Questions One and Two asked whether Marinecorp and Chopper or Outlaw, respectively, failed to comply with the lease agreement. Question Three asked the jury "Who failed to comply with the agreement first?"

By its second issue, Marinecorp argues that the evidence adduced at trial was legally and factually insufficient to support the jury's answer to Question Three. (MC Brief, p. 20). By its second issue, Marinecorp also argues Question Three was improper because Chopper and Outlaw chose to treat their respective leases as continuing after Marinecorp breached, thereby waiving any excuse for their own future nonperformance.[12]

---

[12] In its second issue, Marinecorp includes the following one line sub-argument:

> The trial court further erred in failing to disregard the jury's answer to Question No. 3 because under the evidence and facts presented, this answer is immaterial, improper, and prejudicial to Marinecorp in that the jury's answer prevented the jury from advancing to questions regarding damages to Marinecorp and its attorney's fees.

(MC Brief, p. 20). But no legal authority is presented in support of this sub-argument and thus it should be summarily overruled. *See* TEX. R. APP. P. 38.1. It should be noted, however, that Question Three did not prevent the jury from answering questions about Marinecorp's alleged damages and attorney's fees. Questions Seven through Nine and Twelve posed questions to the jury concerning these matters.

**A. Sufficient Evidence Supports the Jury's Finding that Marinecorp Breached First**

Marinecorp cites no legal authority and offers no explanation or argument for its contention that the evidence is factually and legally insufficient to support the jury's answer to Question Three. Accordingly, this Court need not address this argument. *See* TEX. R. APP. P. 38.1. To that extent, Issue 2 should be summarily overruled. *See id.*

In the alternative that this Court reaches the merits of this sufficiency point, as summarized above in the facts section of this brief, Miller, Tibbs, Tones and Marinecorp's own a/c and electrical work men, Dang and Hofelich, all testified about how Marinecorp first breached its duty to provide parking-lot lights for Choppers, and electrical capacity, connected a/c and necessary roof repairs for Outlaw Country. This evidence was legally and factually sufficient to support the jury's finding that Marinecorp breached the lease agreements first. *See City of Keller,* 168 S.W.3d at 827; *Cain*, 709 S.W.2d at 176; *Pool*, 715 S.W.2d at 635.

**B. Chopper and Outlaw Country were Allowed to Try to Protect their Investment by Working to Continue Under the Leases**

Marinecorp's argument that Chopper and Outlaw waived Marinecorp's first breach of the lease agreement fails for at least two reasons: (1) by law a tenant may attempt to protect his investment by continuing under a lease after a material breach of contract that violates the implied warranty of suitability in a commercial

34

lease; and (2) even assuming, for the sake of argument only, Chopper and Outlaw Country's suit for breach of the implied warranty of suitability were completely isolated from their respective contract claims (or were waived under a contract theory to use Marinecorp's language), Marinecorp first breached by arbitrarily changing the rent amounts due under the lease agreements and then locking Chopper and Outlaw Country out of their respective spaces even after they paid any outstanding rent balances.

A commercial tenant's performance under a contract may be excused by the landlord's failure to comply with a material obligation of the lease or by the landlord's breach of its implied warranty of suitability for commercial purposes. *See e.g., Parts Indus. Corp. v. AVA Svs., Inc.*, 104 S.W.3d 671, 677 (Tex. App— Corpus Christi 2003, pet. denied). Marinecorp's reliance on *Long Trusts v. Griffin*, 222 S.W. 3d 412 (Tex. 2006)(per curiam) and similar cases is misplaced because these cases are off-point in this specific commercial-lease context. (MC Brief, pp. 21-22).

In a commercial lease, the lessor makes an implied warranty that the premises are suitable for the intended commercial purposes. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am., Inc.*, 341 S.W.3d 323, 340 (Tex. 2011)(*citing Davidow v. Inwood N. Prof'l Group—Phase I,* 747 S.W.2d 373, 377 (Tex. 1988)). "Specifically, a lessor impliedly warrants that at the inception of the

lease, no latent defects exist that are vital to the use of the premises for their intended commercial purpose." *Id.* A lessor is responsible for ensuring that "essential facilities will remain in a suitable condition." *Id.* To establish a breach of this warranty, a lessee must show that a latent defect in the facilities existed at the inception of the lease, that the facilities were vital to the use of the premises for the intended purposes, and that the lessor failed to repair the defect. *See id.* The tenant's obligation to pay rent and the lessor's implied warranty of suitability are mutually dependent. *Davidow*, 747 S.W.2d at 377.

The case of *A.V.A. Services, Inc.* is legally and factually similar to the present case in many key respects—including that on appeal the landlord presented a mountain of nineteen meritless issues which the appellate court rejected in affirming the trial court's judgment in favor of the lessee. *See A.V.A. Svs., Inc.*, 104 S.W.3d at 674-75. In *A.V.A. Services, Inc.*, GPK Parts Industries leased to AVA a commercial warehouse located in Beaumont. *Id.* The lease contained an option to purchase the space at the end of the lease term, which AVA planned to do. *See id.* at 680. Despite assurances that the warehouse space would be in good condition and the landlord's contractual obligation to maintain the roof in good repair, there were always massive roof leaks which led to electrical problems. *Id.*

Acting through the real estate agent who negotiated the lease agreement, GPK made some roof repairs but they were inadequate. *Id.* at 676. After GPK

36

failed to repair the roof successfully, AVA had some of the roof repairs made, *see id.* at 680, but it could not afford the $75,000 cost of replacing the roof. *See id.* at 676. A good portion of AVA's inventory, machinery, equipment, and vehicles were damaged over a course of four years. *Id.* at 684. AVA repeatedly complained and asked the landlord to make the necessary repairs. *Id.* at 676. Under the lease contract, AVA sought reimbursement from GPK for the repairs it made, but in breach of the contract, GPK refused to reimburse. *Id.* at 680.

At trial and on appeal, GPK argued that once it breached by not reimbursing for the roof repairs, AVA had to elect to continue under the contract thereby waiving the roof repairs or terminate and sue for damages. *See id.* Because AVA attempted to continue performance under the contract for years, GPK argued AVA waived its right to complain about the breach of the lease or breach of the implied warranty of suitability based on the condition of the roof. *See id.*

The appellate court disagreed and explained as follows that AVA did not have to make a Hobson's choice of abandoning its investment and terminating the lease to sue:

> …AVA was not obligated to terminate the lease. GPK could not gain termination of the lease by simply denying AVA's right to have roof repair expenses reimbursed by GPK. The lease provided AVA the remedy to terminate the lease if GPK failed to repair the roof but did not require AVA to terminate the lease to recover the roof repair expense from GPK. AVA was not financially able to terminate the lease and lose its $40,000.00 investment in the lease to make it

suitable, and desired to purchase the property under the option to purchase.  AVA had good faith reasons to not terminate the lease.

*Id.* at 680.  More recently, in *Italian Cowboy Partners*, the Supreme Court of Texas held, as in *A.V.A. Services*, that a commercial tenant may first try to work with the landlord to remedy a breach of the implied warranty of suitability without losing its right to later rescind the lease agreement or stop paying rent:

> …Were we to find the attempts made here to remedy the defect sufficient to foreclose the possibility of rescission because of ratification, similarly-situated commercial tenants would be placed in the difficult position of being pushed to abandon a lease at the first sign of any trouble, so as to avoid potentially being trapped in a lease of property containing a defect rendering it unsuitable for commercial purposes.  This is unsound policy; we must allow a balance between making initial attempts to diagnose and remedy a premises defect while preserving the right to rescind a lease if such attempts are unsuccessful.  Thus, we conclude that under the facts of this case, Prudential has not established that Italian Cowboy's remaining in occupancy, while both parties made unsuccessful attempts to remedy the odor, gives rise to ratification of the lease contract after Italian Cowboy acquired knowledge of the defect.

> The trial court awarded both rescission of the lease and damages to restore Italian Cowboy to the position it would have been in absent Prudential's breach of warranty.  Rescission of a commercial lease is indeed a proper remedy for breach of the implied warranty of suitability, as are such damages.  *See Davidow*, 747 S.W.2d at 377 (stating that because a landlord breached the implied warranty of suitability, the tenant "was therefore justified in abandoning the premises and discontinuing his rent payments"); *accord Gober v. Wright,* 838 S.W.2d 794, 798-99 (Tex. App.—Houston [1st Dist.] 1992, writ denied)("[W]e upheld the jury's finding that the premises were unsuitable for their intended commercial purposes after June 2, 1988. This finding relieved lessees from their obligation to pay any rent after that date."), *abrogated on other grounds by State Farm Fire & Cas. Co. v. Morua,* 979 S.W.2d 616 (Tex.1998).

*Italian Cowboy Partners, Ltd.*, 341 S.W.3d at 344-45.

As in *A.V.A. Services* and *Italian Cowboy Partners*, Chopper and Outlaw Country were allowed to treat the leases as continuing after Marinecorp's breach of contract and the implied warranty of suitability. Chopper and Outlaw Country had good faith reasons for doing so and it would be bad policy, and legal error to punish them for doing so. Miller and Tones had invested significant sums of money, and Miller significant physical labor as well, in renovating the two lease spaces, and opening businesses he hoped to later sell.

It was only rational for Choppers to help its business and demand that Marinecorp repair the non-functioning parking-lot lights. As it turned out, Marinecorp did not have the parking-lot lights attached to an electrical meter until September 2010 at best and after the inception of the lease, Marinecorp started claiming the lights did not function because of faulty underground wiring.

Likewise, it was a sensible business decision for Outlaw Country to try to continue under the lease after Marinecorp breached its contractual and implied warranty obligations with regard to the air conditioning, electrical delays, and the roof. By contract and under the implied warranty of suitability, at the latest, these items should have been in good repair by the commencement date of the lease, November 1, 2010.

It was only after the commencement date, that the full extent of the roof's disrepair became apparent. For example, at or around the time of the December 29, 2010 down pour, a massive leak started on a new stage Miller built in Outlaw Country. Miller realized a piece of conveyor belt had been affixed to the roof with tar, and when it gave way, a new leak ensued.

As to the air-conditioning, Marinecorp did not even attempt a test of the 60 ton system until after November 1, and after performing the test using electricity from its parking-lot meter, it apparently had three of the four units unhooked from any electrical source. So while the one hooked-up unit provided Miller air-conditioning for the office space in Outlaw Country, and provided the impression the air-conditioning was operable, when Miller attempted to run the full air-conditioning system for a February 2011 grand opening concert, featuring country star Tracy Lawrence, the air-conditioning was inadequate for the crowd.

Because Chopper and Outlaw did not waive their rights (to withhold rent and later sue if necessary) by attempting to continue under the leases after Marinecorp's breached, Jury Question Three—who breached first—was relevant and proper. *See Italian Cowboy Partners, Ltd.*, 341 S.W.3d at 344-45; *Davidow*, 747 S.W.2d at 377; *A.V.A. Svs., Inc.* 104 S.W.3d at 680. Marinecorp's second issue should be overruled for this reason alone.

**C.   Even under a Strict Contract Analysis, Jury Question Three was Proper because *Griffin* is inapplicable.**

Even setting aside the implied warranty of suitability for the sake of argument only and looking at the question exclusively as one of contract law, as Marinecorp apparently does in its second issue, Jury Question Three was proper in this case.[13]   (*See* MC Brief pp. 20-22).   In other words, in the alternative, the *Griffin* rule on which Marinecorp relies can be considered in this case without finding Chopper and Outlaw Country waived any of Marinecorp's breaches and the right to sue for breach.   (MC Brief pp. 21-22).   *Griffin* just does not apply the way Marinecorp suggests.

The case of *B&W Supply, Inc. v. Beckman*, 305 S.W.3d 10 (Tex. App.— Houston [1st Dist.] 2009, pet. denied), is illustrative of this point.   B&W and the Beckmans contracted for B&W to perform remodeling work in several rooms of the Beckmans' home for $60,000.   *Id.* at 14.   The contract called for various progress payments throughout the project.   *Id.*   In early 2006, the Beckmans had paid B&W $30,000 and half of the project remained to be finished.   *Id.*   Around this time a dispute arose leading B&W to cease all work on the project.   The

---

[13]   Under the caselaw, when the same duty arises by express contract and implied warranty (e.g., in this case, for Marinecorp to provide parking-lot lights, 60 tons of a/c, 1,000 amps of electrical capability and maintain roof in suitable condition), there can be a degree of legitimate overlap in the jury submission on the landlord's breach of the implied warranty of suitability for commercial purposes and its breach of contract.   In *A.V.A. Services*, the jury was instructed on both the implied warranty and breach of express contract, and the jury found that the landlord GPK "failed to comply with the lease" without specifying under which theory of relief.   *See* 104 S.W.3d at 676, 683.

41

Beckmans sued for breach of contract, breach of the Deceptive Trade Practices Act, and under various other theories. *Id.* B&W counterclaimed under the contract for lost profits. *Id.* "The parties presented conflicting evidence on whether the Beckmans fired B & W or whether B & W walked off the job." *Id.*

Relying on *Griffin*, the Beckmans argued on appeal that B&W could not recover its lost profits under the contract because it treated the contract as continuing after the Beckman's initial breach. *See id.* at 19 (*citing Griffin*, 222 S.W.3d at 412). The evidence showed that after Mr. Beckman asked B&W's contractor its profit margin on the project, Mr. Beckman became upset and demanded line-item approval for the remainder of the work. *Id.* When the contractor answered he could not comply with this request, Mr. Beckman told him he did not want him on his property and, in two different conversations, told the contractor not to come back to the job. *Id.* The Beckmans did not pay B&W the third draw on the contract, which had already come due when the argument occurred. *Id.* B&W concluded it had been fired and sued for its lost profits. *Id.*

As this Court explained, under *Griffin*, after a material breach of contract, the non-breaching party may be excused from future performance and may terminate and sue for the breach as long as the non-breaching party does not waive the breach by continuing its own performance under the contract as though the breach did not occur. *Id.* at 19 (*citing Griffin*, 222 S.W.3d at 415). This Court held

the *Griffin* rule was inapplicable to B&W's breach-of-contract claim because B&W did not treat the contract as continuing, and the Beckmans did not point to any evidence that B&W believed that the contract was continuing. *Id.* Instead, the evidence showed that B&W believed that it had been fired from the job and stopped work on the Beckmans' house. *Id.* Accordingly, it was proper for the trial court to submit to the jury whether B&W's non-performance under the contract was excused and for B&W to recover its lost profits. *Id.* at 18-19.

In this case, as in *Beckman*, the *Griffin* rule is inapplicable to bar Chopper and Outlaw Country's breach-of-contract claims and the related Jury Question Three regarding who breached first.[14]  In *Beckman* and in this case, the evidence was conflicting. Like the firing of the contractor in *Beckman*, after Marinecorp locked out Chopper and Outlaw Country (before the deadline to bring rents current and despite ultimately bringing rent payments current) Chopper and Outlaw Country could not continue performance under the respective leases. Marinecorp points to no evidence Chopper and Outlaw Country continued to operate in the leaseholds after the lockout. The *Griffin* rule is simply inapplicable under the facts of this case and Marinecorp's second issue should be overruled.

---

[14]  Interestingly in this case, as to Outlaw Country, the jury found Marinecorp breached the lease agreement first (Question 3), Outlaw Country breached the lease (Question 4) and while its breach was not excused Outlaw Country did not owe Marinecorp rent (Question 7). Apparently, the jury found, as the evidence showed, that Outlaw Country caught up on any outstanding rent payments and did not owe Marinecorp any more rent.

## ISSUE THREE (RESTATED)

Sufficient Evidence Supported the Jury's Finding that Marinecorp Failed to Mitigate its Alleged Damages

By its third issue, Marinecorp argues the trial court should have rendered judgment for its alleged past and future rent damages from Chopper and Outlaw Country because there was "ample evidence" Marinecorp mitigated its alleged damages. Specifically, Marinecorp argues the trial evidence is legally and factually insufficient to support the jury's answers that Marinecorp failed to use reasonable care and diligence to mitigate its damages, if any, (Question No. 8) and that Chopper and Outlaw Country did not owe Marinecorp outstanding past or future rent (Question No. 7).

Marinecorp cites no legal authority under issue three of its brief and has therefore arguably waived this issue. *See* TEX. R. APP. P. 38.1(i)("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and the record." However, issue three is also easily defeated on the merits. There was sufficient evidence to support the jury's answer to both of these questions.

Texas law requires a landlord claiming a tenant breached the lease to mitigate its damages by attempting to re-lease a vacant or abandoned property. *See* TEX. PROPERTY CODE ANN. § 91.006 (West 2015); *see also Austin Hill Country Realty, Inc. v. Palisades Plaza, Inc.,* 948 S.W.2d 293, 299-300 (Tex.1997),

44

*abrogated, in part, by* TEX. PROP. CODE ANN. § 91.006. This duty to mitigate was first recognized in Texas because of the contractual nature of the landlord-tenant relationship and the general contract principle that one should mitigate his damages after a breach. *See Austin Hill Country Realty, Inc.*, 948 S.W.2d at 295-97. Later, the duty became a statutory duty as well. *See e.g.,* TEX. PROP. CODE ANN. § 91.006. The landlord is not required to lease the premises to just any willing tenant, but must make objective, good-faith efforts to lease to a replacement tenant who is suitable under the circumstances. *See Austin Hill Country Realty, Inc.*, 948 S.W.2d at 299; *see also White v. Harrison*, 390 S.W.3d 666, 675-76 (Tex. App.—Dallas 2012, no pet.)(holding landlord not required to re-lease to defaulting person whom first tenant gave possession, when landlord's reasonable efforts successfully re-leased space to rent-paying tenant for remaining four years of lease agreement).

In this case, even when Outlaw Country and Chopper brought their rent payments current in the face of fluctuating alleged rent amounts, Marinecorp insisted on locking these tenants out. The tenants did not abandon the leasehold.

Marinecorp's own property manager Mirza testified it is not financially desirable to have vacant space in the shopping center. Marinecorp's post-lockout listing agent for the spaces, Fred Ghabriel, its Senior Property Manager, Wolochin, and Tibbs all testified that numerous prospective tenants were interested in leasing the space, but even through the time of trial, Marinecorp would not lease to anyone

45

apparently because it did not want any tenant that sold alcohol. (5 RR pp. 218-219). Marinecorp offered no evidence of a rationale for having the two spaces renovated as a bar and grill and dance hall, respectively, and then refusing to lease to a seller of alcohol. On this record, the jury had legally and factually sufficient evidence from which to conclude Marinecorp failed to mitigate its damages. *See City of Keller,* 168 S.W.3d at 827; *Cain*, 709 S.W.2d at 176; *Pool*, 715 S.W.2d at 635.

The evidence was likewise sufficient to support the jury's conclusion that Chopper and Outlaw Country did not owe Marinecorp past or future rent as damages. First, Miller testified any outstanding rent amounts were brought current, but Marinecorp still went through with the lock out. (4 RR p. 140). This alone was sufficient to support the jury's findings under Question No. 7. *See City of Keller,* 168 S.W.3d at 827; *Cain*, 709 S.W.2d at 176; *Pool*, 715 S.W.2d at 635. Legally, as discussed above in response to Issue 2 on appeal, Chopper and Outlaw Country were not obligated to pay outstanding rent after Marinecorp breached the implied warranty of suitability for commercial purposes and failed to timely cure its breaches. For these reasons, Marinecorp's third issue on appeal should be overruled.

## ISSUE FOUR (RESTATED)

Sufficient Evidence Supported the Jury's Verdict. The Jury was not Required to Conclude that Outlaw Country Delayed its Own Opening.

By its fourth issue Marinecorp argues, Outlaw Country should not have been awarded damages under Jury Question No. 6 (breach of contract) because the evidence showed Outlaw Country delayed its own opening. This issue should be overruled because it is moot, and in the alternative, sufficient evidence supported the jury's findings under Question 6 that Marinecorp breached its contract with Outlaw Country. There was ample evidence that Outlaw Country was ready to open on time, but Marinecorp failed to timely provide it electrical hook ups, a/c, and a good roof.

First, as described below, under Issue 11, in its Modified Final Judgment, the trial court did not award Outlaw Country or Chopper damages for breach of contract. (Jury Question No. 6). Second, as summarized above under the Statement of Facts, legally and factually sufficient evidence showed Marinecorp breached its lease with Outlaw Country and caused its delayed grand openings. Despite Marinecorp's argument that Miller should have obtained a temporary construction meter to have electricity for permitting inspections, such a meter would have been inadequate to operate Outlaw Country and Miller testified he could have even obtained expedited permitting and opened on time had Marinecorp timely furnished electrical hook ups. (4 RR p. 137, l. 1-11). The jury, as the sole judge of the weight and credibility of the evidence, reasonably

concluded that Marinecorp breached its contract with Outlaw Country. *See City of Keller,* 168 S.W.3d at 827; *Cain*, 709 S.W.2d at 176; *Pool*, 715 S.W.2d at 635.

## ISSUE FIVE (RESTATED)

The Trial Court Correctly Rejected Marinecorp's Proposed Jury Question Concerning Whether Outlaw Country Failed to Mitigate its Damages Because Neither the Law nor Evidence Supported Such a Question in This Case.

By its fifth issue Marinecorp argues the trial court reversibly erred by not submitting Marinecorp's proposed jury question on whether Outlaw mitigated its damages. First, this issue should be overruled because Marinecorp cites no authority that a tenant has a duty to anticipatorily mitigate damages for a landlord's impending breach of the implied warranty of suitability.

Second, whether analyzed under tort or contract law, for the sake of argument only, Outlaw Country's duty to mitigate could not have arisen *before* Marinecorp failed to timely provide electrical capacity to the Outlaw Country space. Marinecorp has not pleaded or cited any evidence in the record that Outlaw Country should have anticipated its breach of its duty to timely provide electricity.

**A.   Marinecorp cites no legal authority that a tenant has a duty to mitigate the landlord's breach of the implied warranty of suitability especially *before* the landlord even commits the breach**

As discussed above, in response to Marinecorp's second issue, Marinecorp had a duty under the implied warranty of suitability to provide Outlaw Country its electrical capacity, air conditioning, and a roof in good repair so that the premises

48

would be suitable for its intended commercial purposes. *See e.g.*, *Italian Cowboy Partners, Ltd.*, 341 S.W.3d at 340. The jury in this case found that Marinecorp breached the implied warranty of suitability. (1 CR 417; Jury Question 14).

Marinecorp cites no legal authority to support its argument under issue five that a tenant has a duty to mitigate or preemptively mitigate when the landlord breaches the implied warranty to provide electricity. *See* TEX. R. APP. P. 38.1. Nor does Marinecorp provide this Court any argument or legal authority for why it should apply such a duty under the facts of this case. *See id.* Contrary to Marinecorp's position, in *Italian Cowboy Partners*, the Supreme Court of Texas held that the landlord could not shift to the tenant its responsibility under the implied warranty of suitability (to repair sewage-line defects that caused a foul odor in the restaurant space); the tenant had not assumed responsibility for such a repair under the lease contract. *See* 341 S.W.3d at 340-41.

As real-estate broker Tibbs testified, Marinecorp was aware that Outlaw Country needed electricity to renovate the vacant Walgreen's between signing the lease in September 2010 and the November 1, 2010 commencement date under the lease. However, November 1 would have been the absolute deadline for providing Outlaw Country functioning electrical capacity. By issue five, Marinecorp is arguing that, amidst a massive $2 million renovation, Outlaw Country should have (1) anticipated before November that its commercial landlord Marinecorp would

fail to supply something as basic as electricity (when Miller had been able to repair and restore electricity to the neighboring Choppers space within a month or less of executing the lease); and (2) Outlaw Country should have attempted to obtain temporary construction electricity for the space for purposes of obtaining an occupancy permit for the space. Marinecorp points to no evidence in the record that Outlaw Country had notice Marinecorp would fail to supply electrical capability prior to the commencement date of the lease, and thus no duty to mitigate would have arisen, even if applicable. *See e.g.*, *Pulaski Bank & Trust Co. v. Texas Am. Bank/Fort Worth, N.A.*, 759 S.W.2d 723, 735 (Tex. App.—Dallas 1988, writ denied)("The [mitigation] doctrine is applicable only if the victim of the wrongdoer's act has knowledge of the fact which makes avoidance of the consequences necessary, and if the damages can be avoided with only slight expense and reasonable effort.").

Even assuming, for the sake of argument only, the temporary construction meter would have supplied electricity for permitting inspections to occur, Outlaw Country's space would have remained unusable for business without electricity post-construction. This Court should overrule issue five and thereby reject Marinecorp's invitation to impose a preemptive duty to mitigate a landlord's breach of the implied warranty of suitability particularly when Marinecorp cites no legal authority for doing so and points to no evidence in the record that Outlaw

50

Country had notice prior to November 2010 that Marinecorp would breach its duty to provide electricity.

## ISSUES SIX THROUGH EIGHT (RESTATED)

Issues Six Through Eight Should be Overruled Because Sufficient Evidence Showed Marinecorp Committed Deceptive Trade Practices and Separately Breached its Written Lease Agreements with Chopper and Outlaw. The record does not show Chopper and Outlaw Country attempted to bring a Property Code wrongful-eviction claim under the DTPA.

By its sixth issue,[15] Marinecorp argues Chopper and Outlaw's claims constitute a breach of contract action, and not a DTPA case. This issue should be overruled because Chopper and Marinecorp pleaded and proved separate DTPA claims and a contract action in this case.[16] By its eighth issue, Marinecorp argues there is "no evidence or insufficient evidence" of various DTPA elements, which will be addressed in turn below.[17]

---

[15] Following the order of Marinecorp's Brief to the extent practicable, Issues Six through Eight will be addressed together in one section, with subsections, because the issues are related. *See* TEX. R. APP. P. 38.2(a)(2)("When practicable, the appellee's brief should respond to the appellant's issues or points in the order the appellant presented those issues or points.").

[16] Contrary to Marinecorp's assertion in Issue 7, the record does not show Chopper and Outlaw Country attempted to bring a Property Code wrongful-eviction claim under the DTPA. (MC Brief, pp. 33–34). Thus, Issue 7 should be overruled as moot.

[17] In its briefing of Issues 6 and 8(b), Marinecorp includes two lines of legally unsupported sub-argument:

Finally, even though the claims of Appellees both sound in contract, no evidence, or insufficient evidence, exists supporting the measure of damages that they would have been entitled to upon meeting their burden, specifically proof of lost profits. (MC Brief, p. 32).

**A.** **Texas law recognizes that DTPA violations and breach of contract may arise in the context of a single case**

Texas law recognizes that a breach of contract and fraud/DTPA violations may arise in the same case, as has happened in prior reported landlord-tenant decisions. In *Italian Cowboy Partners*, while the plaintiff restaurant did not raise a DTPA claim per se, the Supreme Court of Texas recognized the plaintiff suing for rescission of the lease contract could also sue the landlord for fraudulently inducing it to enter the lease. *See* 341 S.W.3d at 331. Specifically, the court held that a standard merger clause in a commercial lease does not insulate a landlord from a fraud action based on its false oral assurances made at the time of contracting. *See id.* at 331-36.

In *Drury Southwest, Inc. v. Louie Ledeaux #1, Inc.*, the Fourth Court of Appeals held that along with its breach-of-contract action, a commercial tenant could raise a DTPA claim against its landlord for fraudulent misrepresentation that it could have any exterior sign it wanted for its business. 350 S.W.3d 287, 291

---

Plaintiffs testified that Chopper was making a profit and Outlaw was breaking even. There was no evidence of any act or omission by Marinecorp that affected this net income. Appellees failed to meet this burden of proof relative to the DTPA element of causation. (MC Brief, p. 35).

In addition, Marinecorp's one-paragraph briefing of its sub-issue 8(b)(D) relating to causation under the DTPA contains no citation to legal authority. (MC Brief, pp. 34-35).

Marinecorp did not adequately brief these sub-issues and thus the sub-issues have been waived on appeal. *See* TEX. R. APP. P. 38.1 ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record.").

(Tex. App.—San Antonio 2011, pet. denied).  In the context of a fraud claim under the DTPA, the Fourth Court summarized succinctly the basic law of suing for breach of contract and a DTPA violation in a single suit as follows:

> A misrepresentation made during contract negotiations may form the basis of a DTPA claim if the defendant misrepresents a material fact about the goods or services sold to the plaintiff. *Doe v. Boys Clubs of Greater Dallas, Inc*., 907 S.W.2d 472, 478 (Tex. 1995); *Church & Dwight Co. v. Huey,* 961 S.W.2d 560, 567 (Tex. App.—San Antonio 1997, pet. denied).  However, the mere failure to perform a contractual obligation cannot form the basis of a DTPA claim.

*Id.*

## B.  Factually and legally sufficient evidence proved Chopper and Outlaw Country's various DTPA claims and contract cause of action

By Issue Eight, Marinecorp challenges the sufficiency of the evidence in the record to show the following elements of Chopper and Outlaw Country's DTPA claims:

(a)  There was no evidence or insufficient evidence to establish that Marinecorp did not have an intention of fulfilling its promise when made.

(b)  There was no evidence or insufficient evidence that any representation by Marinecorp was a producing cause of damages to Chopper and Outlaw.

(c)  There was no evidence or insufficient to establish that Marinecorp's actions were unconscionable.

(d)  There was no evidence of insufficient evidence to establish that Marinecorp breached an implied warranty, as the lease provisions stated the tenants accepted the property in its "as-is" condition.

(MC Brief, p. 30). Marinecorp also argues erroneously that there is no evidence or insufficient evidence that it "knowingly" violated the DTPA. (MC Brief, p. 38).[18]

In its live pleading at the time of trial, Chopper and Outlaw each sued for breach of contract, breach of the implied warranty of suitability in a commercial lease, and they also asserted DTPA claims for breach of the implied warranty and engaging in an unconscionable course of action. (Plaintiffs' Fourth Amended Original Petition, p. 5-6)[19]; *See* TEX. BUS. & COMM. CODE ANN. § 17.50(a)(2), (3)(West 2015). Chopper and Outlaw Country also sued Marinecorp for violating several subsections of section 17.46(b) of the DTPA.[20] Chopper and Outlaw

---

[18] In passing, Marinecorp seems to include in its argument under Issue 8 that Tony Miller, a contractor by trade, was too "sophisticated" to be a "consumer" entitled to the protections of the DTPA. (MC Brief pp. 36-37). This is a specious argument that one has to be a "bumpkin" to be protected under the DTPA. Consumer is actually defined as follows in the DTPA:

> (4) "Consumer" means an individual, partnership, corporation, this state, or a subdivision or agency of this state who seeks or acquires by purchase or lease, any goods or services, except that the term does not include a business consumer that has assets of $25 million or more, or that is owned or controlled by a corporation or entity with assets of $25 million or more.

TEX. BUS. & COMM. CODE ANN. § 17.45(4). Miller meets this definition of consumer because he was an individual who sought or acquired by purchase or lease goods or services. Evidence concerning Miller's personal assets was presented at trial and he did not have the assets to personally fund the renovations of the leaseholds in this case, which cost well under $25 million. (3 RR p. 161, l. 22-p. 162, l. 20).

[19] Chopper and Outlaw are requesting that the Clerk of the trial court prepare and file in this cause a supplemental record that includes their Fourth Amended Original Petition which was filed in the trial court on December 12, 2013.

[20] For example, Chopper and Outlaw Country alleged Marinecorp violated the following subsections of Section 17.46(b):

Country alleged Marinecorp's DTPA violations were knowing and that they were

entitled to treble damages as a result.[21]

---

(9) advertising goods or services with intent not to sell them as advertised;
…

(12) representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law;
…

(24) failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed.

*See* TEX. BUS. & COMM. CODE § 17.46(b)(9), (12), (24)(West 2015).

[21] Section 17.50(b) of the DTPA sets forth treble damages for a knowing DTPA violation, and, in context, it reads as follows:

(a) A consumer may maintain an action where any of the following constitute a producing cause of economic damages or damages for mental anguish:
  (1) the use or employment by any person of a false, misleading, or deceptive act or practice that is:
    (A) specifically enumerated in a subdivision of Subsection (b) of Section 17.46 of this subchapter; and
    (B) relied on by a consumer to the consumer's detriment;
  (2) breach of an express or implied warranty;
  (3) any unconscionable action or course of action by any person; or
…

(b) In a suit filed under this section, each consumer who prevails may obtain:
  (1) the amount of economic damages found by the trier of fact. If the trier of fact finds that the conduct of the defendant was committed knowingly, the consumer may also recover damages for mental anguish, as found by the trier of fact, and the trier of fact may award not more than three times the amount of economic damages; or if the trier of fact finds the conduct was committed intentionally, the consumer may recover damages for mental anguish, as found by the trier of fact, and the trier of fact may award not more than three times the amount of damages for mental anguish and economic damages;
…

TEX. BUS. & COM. CODE ANN. § 17.50 (West 2015).

The DTPA defines "knowingly" as follows:

"Knowingly" means actual awareness, at the time of the act or practice complained of, of the falsity, deception, or unfairness of the act or practice giving rise to the consumer's claim or, in an action brought under Subdivision (2) of Subsection (a) of Section 17.50, actual awareness of the act, practice, condition, defect, or failure constituting the breach of warranty, but actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness.

*Id.* § 17.45(9). As demonstrated below, the evidence at trial was sufficient to allow the jury to infer that Marinecorp acted knowingly in perpetrating each of its DTPA violations. *See e.g.*, *Jim Walters Homes, Inc. v. Valencia*, 690 S.W.2d 239, 242 (Tex. 1985). In other words, the conduct was of a nature that a person would have had actual awareness of the character of his act at the time it was committed. *See id.*

At trial, the evidence was also sufficient to show separate actions on Marinecorp's part, committed at different points in time, that proved these causes of action. This case is unlike *Tony Gullo Motors, I L.P. v. Chapa* on which Marinecorp relies. *See* 212 S.W.3d 299, 304 (Tex. 2006). In *Chapa*, the plaintiff alleged only one injury—delivery of a base-model car instead of a premium-model car—and therefore could only recover under one of the several theories she pleaded. *Id.* at 303. In this case, the jury questions were submitted in broad form, *see* TEX. R. CIV. P. 277, and one way in which the jury could have found the separate injuries and causes of action, under the evidence presented, is as follows.

56

## 1.    Breach of Implied Warranty of Suitability

As set forth in the facts section of this brief and in response to Marinecorp's second issue, the evidence at trial showed breach of the implied warranty of suitability in a commercial lease which is actionable under the DTPA. *Id.* § 17.50(a)(2). Specifically, Marinecorp failed to provide Choppers parking-lot lights which was a common-area item for which it was responsible. *See e.g., Davidow*, 747 S.W.2d at 374-75 (recognizing failure to provide electricity some days, trashy parking lot, and non-working light fixtures in office space as breaching implied warranty of suitability); *see also Gym-N-I Playgrounds, Inc. v. Snider*, 220 S.W.3d 905, 910 (Tex. 2007)(discussing facts of *Davidow* and explaining "*Davidow* illustrates the purpose of the implied warranty of suitability."). Marinecorp failed to provide Outlaw Country a repaired roof, electrical capability, and functional air conditioning.

Marinecorp argues on appeal that "as-is" clauses in the leases absolved it of any duty under the implied warranty of suitability. (MC Brief, pp. 39–41). This is simply false. *Snider* is the leading case on the extent to which an as-is clause can negate the implied warranty of suitability in a commercial lease. *See id.* In *Snider*, the Supreme Court of Texas explained that the language of each lease determines the extent to which the warranty is waived or not. *Id.* at 910-11. Some leases, for example, contain as-is language combined with language that expressly sets forth

the lessor's responsibility to perform certain maintenance and repairs (e.g., the roof). *Id.* at 911.

In *A.V.A. Services, Inc.*, AVA accepted the warehouse in "as is" condition, but the lease expressly made the lessor responsible for maintaining the roof "in good repair." 104 S.W3d at 681. Accordingly, the lessor was responsible for maintaining the roof in good repair both as a matter of contract and under the implied warranty of suitability. *Id.* at 681-82. In this case, as in *A.V.A. Services, Inc.*, Marinecorp expressly maintained responsibility for the items at issue in this lawsuit. In the Outlaw Country lease, immediately under the "as is" language in the form contract (lease Section 3.1), the parties excepted that Marinecorp would be responsible for installation of electrical service at 1,000 amps and providing 60 tons of air conditioning. (1 CR 26). The standard form language also specified that Marinecorp would remain responsible for maintaining the roof in good repair. (1 CR 31; Lease 7.1). In the Chopper lease, the form as-is language applied to the rented leasehold itself, but lease provided Marinecorp was responsible for common areas, including parking-lot lighting. (1 CR 27; Lease 5.1) Accordingly, under the lease language in this case, there is no waiver of the implied warranty of suitability that touches on the claims raised. *See id.; see also Snider*, 220 S.W.3d at 911.

58

### 2. Fraudulent Inducement

A landlord's fraudulent misrepresentation used to induce the tenant to enter a commercial lease is actionable under the DTPA. *See e.g., Drury S.W., Inc.*, 350 S.W.3d at 291. Because intent to defraud is not usually susceptible of direct proof, slight circumstantial evidence of fraud is sufficient to support a finding of fraudulent inducement. *Chapa*, 212 S.W.3d at 305 (*citing Spolijaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986)). In August 2010, Marinecorp fraudulently induced Outlaw Country to enter into an agreement to renovate and lease its vacant, former-Walgreens space. One way Marinecorp did this was by promising repeatedly to remedy the non-functioning parking-lot lights at Choppers "immediately." Tibbs and Miller both testified this promise was key in Miller's decision to renovate and lease Marinecorp's larger second space. Marinecorp's property manager and leasing agent Mirza testified that he knew Miller relied on the promise at the time of deciding whether to enter into the Outlaw Country lease with Marinecorp. Yet when Marinecorp represented to Miller that it would fix the lights immediately, it did not even have an electrical meter in place so that the lights could be turned on. The evidence showed that Marinecorp did not obtain a meter until much later, and that it did not hire a licensed electrician to address the problem.

59

### 3.    Unconscionable Course of Action

Under the DTPA an "unconscionable action or course of action" is defined as "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." *See* TEX. BUS. & COM. CODE ANN. § 17.45 (West 2015).  A finding that a defendant engaged in an unconscionable act or course of action is sufficient to support a DTPA action even in the absence of specific misrepresentations. *Commercial Escrow Co. v. Rockport Rebel, Inc.*, 778 S.W.2d 532, 538 (Tex. App.—Corpus Christi 1989, writ denied).

In this case, the evidence showed that Marinecorp entered into contracts with Chopper and Outlaw Country, respectively, under which Miller would dramatically improve and renovate its long-vacant spaces and lease them for his businesses.   Unbeknownst to Miller, Marinecorp would thereby be able to refinance the shopping center using a major bank, Wells Fargo, instead of having a related family company hold the note for the shopping center.  (6 RR pp. 64, 72-73).  But, Marinecorp disfavored tenants, like Choppers Sports Bar and Grill and Outlaw Country, which served alcohol.  So, as its own property manager, Mirza, told realtor Tibbs, Marinecorp never really expected Miller's businesses to succeed in the shopping center anyway.  Tibbs testified that nothing Miller did seemed "good enough" for Marinecorp after the renovations were completed.  Tibbs

believed Marinecorp did not want Miller in business at the shopping center and did everything possible to get rid of him. Tibbs testified that in his twenty-year career as a commercial real-estate broker, he had never before seen anything like this.

### 4. Continued Unconscionable Course/Breach of Contract

Later, Marinecorp breached the lease contracts by changing rent amounts and wrongfully locking Chopper and Outlaw Country out of their respective leaseholds. Specifically, the evidence at trial showed that even though Marinecorp had promised Outlaw Country two additional months' "free rent" for December 2011 and January 2012, it later went back on this written promise and demanded those rent amounts. Even after all funds for both spaces were tendered or paid, Marinecorp made new excuses and conditions for not accepting the payments and wrongfully locked out Chopper and Outlaw Country. This lockout deprived Chopper and Outlaw Country of valuable possessions in their leaseholds and the opportunity to continue business operations.

The lockout was the culmination of Marinecorp's unconscionable course of action. That the same facts also amounted to a breach of contract does not constitute a double recovery in this case, because in its Modified Final Judgment, the trial court excluded damages for lost benefit of the bargain under both contract and DTPA, and excluded remedial and lost-income damages for breach of contract. *Compare* Jury Answers to Question Nos. 6 and 16 with Modified Final Judgment

(1 CR 409, 419-20, 589-91).  In other words, the trial court's judgment awards DTPA damages (based on the jury's answer to Question No. 16), but it does not award any damages for breach of contract (based on the jury's answer to Question No. 6).[22]

For the foregoing reasons and because Chopper and Outlaw Country proved its various, distinct DTPA and breach-of-contract causes of action by legally and factually sufficient evidence, *see City of Keller*, 168 S.W.3d at 827; *Cain*, 709 S.W.2d at 176; *Pool*, 715 S.W.2d at 635, Marinecorp's sixth through eighth issues on appeal should be overruled.

## ISSUE NINE (RESTATED)

The Trial Court's Modified Final Judgment Awarding Prejudgment Interest Should be Affirmed Because Issue Nine is Unpreserved for Appellate Review.

By its ninth issue on appeal, Marinecorp argues the trial court's award of prejudgment interest in its Modified Final Judgment should be "appropriately" remitted or reversed because the time and date from which the calculation is made is too uncertain.  (MC Brief, pp. 41-42).  Because this contention was not urged below in the trial court, this Court should not consider it on appeal.  *See* TEX. R. CIV. P. 166a(c)("Issues not expressly presented to the trial court by written motion,

---

[22] The trial court's intent to award DTPA damages and not contract damages is also evident in the language of the Modified Final Judgment that immediately follows each actual-damage award.  That language awards Chopper and Outlaw Country $11,000 each based on the jury's findings of "knowing" DTPA violations.  (1 CR 590).

answer or other response shall not be considered on appeal as grounds for reversal."); *D.R. Horton-Tex., Ltd. v. Markel Int'l Ins. Co.*, 300 S.W.3d 740, 743 (Tex. 2009); *see also* TEX. R. APP. P. 33.1(a)(1)(requiring record-showing that a claim was raised to preserve error for appellate review).

In the alternative that the merits are of Issue 9 are reached, it should be observed that an award of pre-judgment interest for a prevailing tenant is proper in a landlord-tenant case. *See e.g.*, *Italian Cowboy Partners*, 341 S.W.3d at 347. Further, the amount of prejudgment interest awarded in this case is relatively modest. For example, the trial court did not calculate prejudgment interest from the time Marinecorp first breached the implied warranty of suitability in each lease. *See e.g., Gober*, 838 S.W.2d at 798-99 ("[W]e upheld the jury's finding that the premises were unsuitable for their intended commercial purposes after June 2, 1988. This finding relieved lessees from their obligation to pay any rent after that date.") Finally, the trial court specified a date certain, April 25, 2012, from which the prejudgment interest began to run.

## ISSUE TEN (RESTATED)

On Appeal, Marinecorp has not Shown Entitlement to Damages for Alleged Breach of Guaranty.

By its tenth issue, the Marinecorp argues the trial court should have awarded Marinecorp damages for Miller and Tones' alleged breach of guaranty agreements. (MC Brief, pp. 42-43). However, this issue presents nothing for appellate review

because Marinecorp failed to support this issue with appropriate argument and citations to the record and legal authority. *See* TEX. R. APP. P. 38.1(i)(providing the brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record).[23]

## ISSUE ELEVEN (RESTATED)

The Trial Court did not Award Cumulative Damages for DTPA Violations and Breach of Contract.

By its eleventh issue, Marinecorp argues that in violation of the one-satisfaction rule, the trial court entered judgment for the following amounts of DTPA damages based on the jury's answer to Question No. 16:

--**For Chopper**: $110,000 for <u>expenses</u> and $100,000 for <u>loss of use</u>, and
--**For Outlaw**: $150,000 for <u>expenses</u> and $140,000 for <u>loss of use</u>.

(MC Brief, p. 44)(emphasis in original).

As explained above, in response to Marinecorp's eighth issue, there is not a "double recovery" in this case[24], because in its Modified Final Judgment the trial court excluded damages for lost benefit of the bargain under both contract and DTPA, and excluded remedial and lost-income damages for breach of contract.

---

[23] As noted above in footnote 12, apparently, the jury found, as the evidence showed, that Outlaw Country caught up on any outstanding rent payments and did not owe Marinecorp any more rent. (1 CR 410; Jury's Answer to Question No. 10). Thus, there would have been nothing to pay on the Outlaw Country guaranty.

[24] This case is therefore distinguishable from *Tony Gullo Motors I, L.P.*, 212 S.W.3d 299, 314 (Tex. 2006), and other cases Marinecorp cites in which it was necessary to reduce the damages awarded in the judgment because they constituted multiple payments, or overlapping awards, for a single injury.

*Compare* Jury Answers to Question Nos. 6 and 16 with Modified Final Judgment (1 CR 409, 419-420, 589-591). In other words, the trial court's judgment awards DTPA damages (based on the jury's answer to Question No. 16), but it does not award any damages for breach of contract (based on the jury's answer to Question No. 6).

Nor are the trial court's awards of DTPA damages cumulative of one another. In the DTPA damages question (i.e., Question No. 16), "expenses" were defined as amounts "incurred…in constructing and equipping the lease premises in order to operate." (1 CR 419). "Loss of use" was defined as "the reasonable value of the lease premises for the time [lessee] was unable to operate due to Marinecorp's conduct." (1 CR 419). There is no overlap between these two measures of damages, and these are the only actual damages awarded in the trial court's Modified Final Judgment. (1 CR 589-591). Accordingly, Marinecorp's eleventh issue should be overruled.

In its eleventh issue, Marinecorp also includes an unpreserved, improperly briefed sub-issue, (MC Brief, p. 47), which it repeats in its thirteenth issue on appeal, (MC Brief, p. 60). By this sub-issue, Marinecorp argues that because the trial court, by apparent typographical error in Jury Question Sixteen, omitted the term "Outlaw" in its definitions of "Expenses" and "Loss of Use," the jury was prohibited from finding damages for Outlaw Country on these elements, though

the trial court provided the jury question blanks for doing so.   (1 CR 419). Because this contention was not urged below in the trial court, this Court should not consider it on appeal.   *See* TEX. R. CIV. P. 166a(c)("Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal."); *Markel Int'l Ins. Co.*, 300 S.W.3d at 743; *see also* TEX. R. APP. P. 33.1(a)(1)(requiring record-showing that a claim was raised to preserve error for appellate review).   Further, Marinecorp did not adequately brief this sub-issue by citing supporting legal authority and thus it has been waived on appeal.   *See* TEX. R. APP. P. 38.1 ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record.").

## ISSUE TWELVE (RESTATED)

On Appeal, Marinecorp has not Shown Entitlement to Damages for Alleged Breach of a Promissory Note.

By its twelfth issue, Marinecorp argues the trial court's modified final judgment should have included $53,000 for Miller's alleged breach of a promissory note to Marinecorp.  However, this issue presents nothing for appellate review because Marinecorp failed to support this issue with appropriate argument and citations to legal authority.  *See id.* (providing the brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities).  Marinecorp offers no legal justification for why Miller would owe it

66

$53,000 on a promissory note for alleged back rent on the Outlaw Country lease particularly when the jury found no outstanding rent was owed on the Outlaw Country lease. (1 CR 410; Jury's Answer to Question No. 10).

## ISSUE THIRTEEN (RESTATED)

Legally and Factually Sufficient Evidence Supports the Trial Court's Judgment Awarding Actual Damages.

By its thirteenth issue, Marinecorp challenges the legal and factual sufficiency of the evidence to support each jury finding awarding Chopper and Outlaw Country actual damages. (MC Brief, pp. 48-70). The scope of this issue is overbroad because, as discussed above under Issue 11, the trial court only entered judgment for actual damages on the jury's verdict for "Loss of Use" and "Expenses" under the DTPA. This appeal is from the trial court's Modified Final Judgment, not the portions of the jury's verdict the trial court disregarded in entering judgment. *See e.g.*, TEX. R. APP. P. 25.1 ("The notice of appeal must…state the date of the *judgment…appealed from.*")(emphasis added).

To the extent Marinecorp challenges the sufficiency of the evidence to prove damage amounts not awarded in the trial court's Modified Final Judgment, Issue 13 is moot. An appellate court lacks jurisdiction to decide moot issues and render advisory opinions. *See Gen. Land Office of State of Tex. v. OXY U.S.A., Inc.*, 789 S.W.2d 569, 570 (Tex. 1990); *Meeker v. Tarrant Cty. Coll. Dist.*, 317 S.W.3d 754, 758 (Tex. App.—Fort Worth 2010, pet. denied); *see also* TEX. R. APP. P. 47.1

("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and *necessary* to final disposition of the appeal.")(emphasis added).

Appellees will respond herein to Issue 13 to the extent it is not moot. A tenant's damages in a landlord-tenant dispute may be sufficiently proven by testimony or documents or a combination of both. *See A.V.A. Svcs., Inc.*, 104 S.W.3d at 684; *see also Italian Cowboy Partners*, 341 S.W.3d at 346 (discussing sufficiency of testimony to prove tenant's damages).

The evidence is legally and factually sufficient to show Chopper's "Expenses" "in constructing and equipping the lease premises in order to operate" were at least $110,000—the amount the jury awarded and the amount the trial court included in its Modified Final Judgment. (1 CR 420, 590). Tones testified about large checks he wrote, totaling well over $30,000, toward the renovation and set up of Choppers. (6 RR pp. 115-116; 12 RR pp. 1-47 (checks)).

Choppers' trial exhibits also include its "Weekly Expense" details that add up to well over $110,000 in expenses for labor and materials expended to build out and prepare Choppers to open for business. (*See* 10 RR p. 72; 11 RR pp. 12, 18, 29, 54, 59, 67, 76). The Weekly Expense details, cited herein, span from May 22, 2010 to August 4, 2010 and total over $147,000.

On their face, the Weekly Expense details are Choppers' book-keeping records and beneath each detail is a stack of receipts that corresponds to the listed expenses. For example, there is a furniture invoice for Choppers' furniture (e.g., tables for customers to use) from AAA Contract Furniture that is stamped "Paid" for $16,156.31. (10 RR p. 83).

The record contains similar evidence[25] of Outlaw Country's "Expenses," sufficient to justify the award of $150,000 in the Modified Final Judgment. (1 CR 420, 590). Commercial Real Estate Broker Tibbs testified that Miller's renovations of the former Walgreens to transform it into the Outlaw Country venue cost about $2,000,000. Miller testified that, together, he and investor Tones spent over $550,000 out of pocket on the renovations for Outlaw Country, and renovations and inventory together totaled over $2,000,000. (3 RR p. 162, l. 15-20; 4 RR p. 73, l. 20-p. 74, l. 16). In addition, Outlaw Country's trial exhibits include weekly "Expense" details that add up to well over $150,000 in expenses for labor and materials expended to build out and prepare Outlaw Country to open for business. (*See* 12 RR pp. 48-57). The Expense details cited herein total over $174,000 expended between September 18, 2010 and November 27, 2010 to build out and set up Outlaw Country to open for business. As with Choppers, the record also contains extensive supporting receipts that correspond to the Expense details.

---

[25] The format of the expense reports for Choppers and Outlaw Country is slightly different, apparently reflecting use of different software.

For example, Outlaw Country paid electrician Hofelich a down payment of $7,500 for one (of many) invoices for material and labor on October 4, 2010. (19 RR p. 64).

Miller testified that in late 2011, Chopper was operating profitably and Outlaw Country was breaking even. (4 RR 82; 6 RR p. 134, l. 2). "Loss of Use" was defined as "the reasonable value of the lease premises for the time [tenant] was unable to operate due to Marinecorp's conduct." (1 CR 419). Around the time Chopper first opened, its business account at Amegy Bank had a balance of just $3,189. (15 RR p. 84). But after Choppers opened for business in July 2010, its monthly deposits steadily increased and even exceeded $30,000 and $50,000 a month for multiple months in 2011. (16 RR pp. 2, 10, 18, 28, 38, 50, 70).

At the end of December 2011, Outlaw Country's bookkeeping records showed earnings of approximately $9,100 on a typical night of sales. (PX 54; 10 RR pp. 10-20). Large events, like the Tracy Lawrence concert, were budgeted to bring in over $25,000 profit in a single night, if successful. (3 RR p. 184). These events with Nashville acts earned a cover price for the concert ticket, in addition to beverage sales. (3 RR p. 150; PX 30; 9 RR p. 64).

Outlaw Country had its own separate business account with Amegy Bank. (17 RR p. 2). Before Outlaw Country had electricity and opened, its account balance as of December 31, 2010 was $6.23. (17 RR p. 2). By the end of February

2011, Outlaw Country regularly had high monthly deposits for 2011, typically between $30,000 and $54,000 per month. (17 RR pp. 17, 25, 33, 39, 45, 51, 57, 65, 70).

While Marinecorp questions the credibility of the damages testimony and accounting records, it was the jury's role to determine the weight and credibility to give the evidence. As summarized above, the trial evidence was legally and factually sufficient to support the trial court's Modified Final Judgment awarding Choppers and Outlaw Country modest actual damages for "loss of use" and "expenses." *See City of Keller*, 168 S.W.3d at 827; *Cain*, 709 S.W.2d at 176; *Pool*, 715 S.W.2d at 635. Accordingly, Marinecorp's thirteenth issue on appeal should be overruled.

## CONCLUSION & PRAYER

For the foregoing reasons, Appellees Miller, Chopper, Outlaw Country, and Tones pray that this Court affirm the trial court's Modified Final Judgment in all respects.

Respectfully Submitted,

**THE AKERS FIRM**

By: _____ /S/ Brock C. Akers _____
    Brock C. Akers
    State Bar No. 00953250
    3401 Allen Parkway, Suite 101
    Houston, Texas  77019
    Telephone:  (713) 877-2500
    Facsimile:   (713) 583-8662
    bca@akersfirm.com

ATTORNEY FOR APPELLEES, THE
CHOPPER GROUP, LLC,
BACKWOODS COUNTRY CLUB,
LLC AND TONY MILLER

AND

**THE COCHELL LAW FIRM, PC**

By: _____ /S/ Stephen R. Cochell _____
    Stephen R. Cochell
    State Bar No. 24044255
    5555 W. Loop S., Suite 200
    Bellaire, Texas  77401
    Telephone:  (832) 767-1065
    Facsimile:   (832) 767-1686
    srcochell@gmail.com

ATTORNEY FOR APPELLEE,
KYLE TONES

72

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that the above and foregoing Appellees' Brief complies with the word count limitations specified in TEX. R. APP. 9.4 and contains 17,914 words.

/S/ Brock C. Akers

Brock C. Akers

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been forwarded to all counsel of record via electronic service as follows:

Macon D. Strother
The Strother Law Firm
4306 Yoakum Boulevard, Suite 560
Houston, Texas 77006
mstrother@strotherlawfirm.com

On this 30th day of November, 2015.

/S/ Brock C. Akers
Brock C. Akers